IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 4, 2005

## IN RE D.M.S., G.H.S., AND T.M.S

**Appeal from the Juvenile Court for Davidson County**
**No. 2119-65253, 2119-65251 and 2119-65252     Betty K. Adams, Judge**

---

**No. M2004-02584-COA-R3-PT - Filed August 9, 2005**

---

Mother appeals the Davidson County Juvenile Court's Order Terminating her parental rights to three children, T.M.S., and D.M.S. and G.H.S.  Father of D.M.S. challenges the trial court's termination of his parental rights.  We affirm the decision of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which Patricia J. Cottrell and Frank G. Clement, Jr., JJ., joined.

Thomas H. Miller and Dennis Nordhoff, Franklin, Tennessee, for the appellants, J.A.S. and J.M.L.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Juan G. Villasenor and William Arthur Tillner, Assistant Attorney Generals, for the appellee, State of Tennessee.

Nick Perenich, Nashville, Tennessee, Guardian Ad Litem.

### OPINION

The children involved in this appeal came into State custody on November 12, 2001, after their mother left them with an unidentified friend.  On that date the friend left the children with DCS personnel giving only limited identifying information for the children and refusing to identify the mother.  Later testimony revealed that the mother had gone to Milwaukee to visit her own mother who was ill at the time.

Twenty-two days later, on December 4, 2001, the mother still had not been identified when the State drafted the first permanency plans for these children.  These plans were presented to the Davidson County Juvenile Court on December 20, 2001, at a preliminary hearing on the State's dependency and neglect petition.  Mother admits that she was present in the courtroom on that date but left prior to the hearing's commencement.  Mother resurfaced and identified herself the following

month. After visiting with her children on January 15, 2002, Mother was arrested on charges from Wisconsin. The case was eventually dismissed on Wisconsin's refusal to extradite, but the incarceration lasted approximately one month.

The dependancy and neglect matter then came before Juvenile Court referee Michael O'Neil in April 2002. The court entered an Agreed Order of Adjudication and Disposition dated May 14, 2002. This Order provides the following pertinent information:

> This matter came on to be heard on the 18th day of April, 2002 before the Honorable J. Michael O'Neil, Referee of the Juvenile Court of Davidson County for trial on the Petition to Adjudicate Dependency and Neglect with Request for Court-Ordered Services filed by the Department on November 5, 2001. [sic][1] Present in the Court were [Mother]; Susie McGowan, Attorney for the mother; Nike Ladapo, GAL for the children; Mary Levinson and Latrika Bean, DCS Case Managers; Ron Taylor, DCS Team Leader; Jessica Doyle, Juvenile Court Probation Officer; and Julie Ottman, Counsel for the Department.
>
> The Court finds that trial on this matter was set for 8:00 a.m.. The mother did not appear in Court until approximately 8:40 a.m.. The Department had already concluded presenting its proof at the time the mother arrived. Prior to the mother's arrival, the State had presented evidence that led the Court to believe that the minor children were neglected and dependent children. However, once the mother appeared, the Court went into recess to allow the parties to speak with one another regarding the allegations as set forth in the State's Petition as the Court could not, in good faith, enter the Order if the mother was tied up in traffic as she claimed. The parties utilized the recess and returned to the Court to announce that the mother is in agreement with the allegations as set forth in the Petition. The Court upon reviewing that agreement finds it to be in the best interest of the children and **ACCORDINGLY ORDERS:**
>
> . . .
>
> On November 12, 2001, Mary Levinson, DCS Case Manager, was assigned an emergency referral regarding the above-named children. The three children were abandoned at the Davidson County Juvenile Court by [Mother]'s "friend." The woman would not provide Court personnel nor CSA personnel with any information regarding the children with the exception of their names and ages. The children were subsequently taken into foster care by the Department of Children's Services as there existed no less drastic alternative to removing the children.

---

[1]Neither party challenges the date of the State's petition appearing in this Order. The mother challenges other findings in the Order regarding her reasons for leaving the preliminary hearing. However, no motion was ever brought before the referee to amend or alter this Order.

Upon coming into the Department's custody, it was noted that all three children were very dirty and emitted a foul odor. [G.H.S.] was observed to have a scar on his right thigh, which resembles a burn. [D.M.S.] has several scars on his back and a four-inch long laceration on his stomach. The children did not have adequate social skills. [T.M.S.] disclosed to Ms. Levinson that he had never attended school.

[Mother] admits that she was aware that her children were in foster care. [Mother] attended Court the date of the Preliminary Hearing on the matter, but left before Court began stating later that she was scared. The mother did not contact the Department regarding her children until the month of January, 2002.

. . .

That the mother has stated today that she wishes to work a Permanency Plan. The parties agree today that the case will be re-staffed on May 3, 2002 at 10:00 a.m. at the Department of Children's Services. The mother is aware today that she must attend this staffing.

That the mother shall be appointed a new attorney. Mr. Steve Mills will assume representation of [Mother] from Ms. McGowan, who was allowed to withdraw on this matter.

That the mother will be allowed to visit with her children as long as she adhears to the following conditions: [Mother] must schedule visitation with Ms. Bean one week before the scheduled visit is to take place. [Mother] must call the day of the visit by 9:00 a.m. to confirm her visit with the children for that day. If [Mother] fails to confirm her visit, no visit with the children will take place. The parties have attempted to impress upon the mother today the importance of visitation with her children as her children will continue to suffer disappointment due to her missing visits.

**That a new Permanency Plan shall be presented to the Court on May 30, 2002 at 9:00 a.m. before the Honorable J. Michael O'Neil.**

The Permanency Plans were revised on May 3, 2002, and signed by Mother. This Plan identified Mother's knowledge of her lack of parenting skills, her position at Home Depot in Memphis, Tennessee, her need to support her children financially and to maintain contact with them. The Plan required Mother to complete parenting classes by November of 2002, maintain stable employment and pay child support before the children could be returned to her custody. In addition, Mother was required to find suitable housing by November 2002. Ms. Latrika Bean was originally assigned as caseworker. Mr. Thongvanh Phrachak took over the case from Latrika Bean on May 20, 2002. The requirements of stable employment, suitable housing and child support were reiterated

in later plans, but Mother never met those requirements prior to the State's petition to terminate her rights.

Though Mother resided in Nashville at the time the children came into custody, since that time, she has resided in Memphis and most recently, Milwaukee, Wisconsin. Mother's contact with the children totaled five total visits between May of 2002 and the following April when the Juvenile Court suspended Mother's visitation rights. The record reveals that Mother never finished parenting classes. In addition, Mother occupied two residences in Memphis, and four to five residences in Milwaukee. Prior to the termination hearing, Mother never provided documentation of employment or stable residence to the Department. At the time of the hearing, Mother could only provide rent receipts for a month-to-month lease on property in Wisconsin. During the Department's involvement in this case, several putative fathers were identified.

None of these putative fathers attempted to legitimate the children prior to the first day of testimony on the State's Petition to Terminate Parental Rights. J.M.L., putative father of D.M.S. and G.H.S. made no move to legitimate D.M.S. prior to the first day of testimony on the State's Petition. Testing was ordered for D.M.S. and G.H.S. but established paternity of D.M.S. alone with a 99.96 percent probability. Throughout the time these children were in foster care, they received no monetary support from Mother or any of the putative fathers. On May 20, 2003, the State filed its Petition to Terminate the parental rights of Mother and the putative fathers of these three children, alleging as grounds abandonment of the children, parents' substantial noncompliance with the permanency plans drafted by the Department, and persistence of conditions which led to the removal and otherwise prevented reunification of the children consistent with their best interests.

The only putative father to attempt to legitimate any of these children was never listed in the three Permanency Plans drafted involving his natural child, D.M.S. Nonetheless, at some point after the staffing of the Permanency Plans (only one of which Mother actually participated in and signed) case manager Phrachak indicated that the putative father and the paternal grandmother of D.M.S. expressed a desire to obtain custody. After being advised by case manager Phrachak of the need to establish paternity of D.M.S., J.M.L. made no attempt in this state to establish his paternity. On the contrary, he attempted to obtain DNA testing in Wisconsin. When it became apparent that such testing could not be done as the children were in state custody in Tennessee, J.M.L. made no further attempt to establish paternity before the first day of testimony. On the first day of hearing, the same being March 24, 2004, the court ordered DNA testing and assigned counsel for J.M.L. The court advised J.M.L. of his right to obtain a continuance. In open court, J.M.L. indicated his wish to go forward with the defense of the Petition. Two days of testimony were heard over a period of four months, after which the court entered its Order terminating both parents' rights to these children. By Order entered the September 20, 2004, Judge Betty Adams Green of the Davidson County Juvenile Court made the following specific findings:

> The Court finds by clear and convincing evidence that grounds exist as to the mother for Termination of Parental Rights under T.C.A. § 361-1-113(g)(1). The mother has willfully failed to visit the children for a period of four consecutive

months prior to the filing of the termination petition. It was undisputed that the last visit by the mother was on August 27, 2002. The termination petition was filed on May 20, 2003 over eight months later. The evidence showed that the mother knew of her obligation to visit, the Department tried to facilitate visitation, and there were no impediments to visitation prior to the order suspending visitation. The mother did not inquire about visitation at any time between the order suspending visitation and the filing of the Petition. The Court also finds that the mother did not visit, or attempt to visit for over four months prior to that order. The mother offered no credible reasons for her failure to visit. The Court finds that the mother's failure to visit was willful.

The Court finds by clear and convincing evidence that grounds exist as to the mother for Termination of Parental Rights under T.C.A. § 36-1-113(g)(1) in that the mother willfully failed to support her children for a period of four consecutive months prior to the filing of the termination petition. The May, 2002 permanency plan, signed by the mother, provides for child support to be paid. At that time, the mother claimed to work for Home Deport in Memphis. Testimony was clear that no child support was ever paid by the mother. The mother was capable of working, and testified that she was gainfully employed at the time of the trial. The mother offered no credible reason why she was unable to pay child support during the four months prior to the filing of the petition. The mother had the ability to support the children and failed to do so. This failure was willful. The parents testified that they purchased Christmas gifts for the children, but the department did not let them give the gifts to the children. The caseworker testified to the contrary. The Court finds that the parents lacked credibility.

The Court finds that the children were removed pursuant to a dependency/neglect proceeding and placed in the custody of the Department of Children's Services. Because the mother could not be located at the time the children were placed into custody, reasonable efforts to prevent removal could not be made. The Court finds that for a period of four months after the removal, the department made reasonable efforts to assist the mother in providing a suitable home for the children. The mother did not make any effort to provide a suitable home for the children. She has demonstrated a lack of concern for the children by not visiting them for a lengthy period prior to trial, and by her own admission, not "getting herself together". It appears unlikely that the mother will be able to provide a suitable home for the children at an early date.

The Court finds by clear and convincing evidence that grounds exist for the termination of parental rights as to the mother under T.C.A. 36-1-113(g)(2) in that there was substantial noncompliance with the permanency plan by the mother. The department prepared three permanency plans during the time the children were in foster care. The basic requirements of the permanency plans were for the mother to

find and maintain suitable housing, attend therapy to address abandonment issues, attend parenting classes, maintain employment, maintain contact with her children, and pay child support. The Court finds these requirements reasonable and related to the conditions which caused the children to come into custody and to the goal of family reunification.

The mother first testified that she had lived at the same residence in Wisconsin for the past seven months, then she testified that she moved from a small apartment to a larger house at the same address in Wisconsin. Prior to that time, she lived in a number of temporary living situations in Wisconsin and Tennessee. The Court is concerned about mother's credibility regarding her living situations. The Court finds that the mother has not shown stability in her residence(s), and her inability or unwillingness to provide a place for the children to live was one of the reasons the children came into custody.

The mother testified that she was undergoing counseling in Wisconsin. The Court granted permission for a late filed exhibit verifying that counseling. The mother did not file any verification with the court. The mother testified on the first day of the trial that she was taking parenting classes, and had attended two of the five classes. She did not complete any more parenting classes by the second day of trial. The mother is in substantial noncompliance with these important requirements which would have helped her address the underlying issues that caused her to stop caring for her children.

The mother did not provide verification of any period of continuous, stable employment. She testified that her employment was erratic and sparse prior to moving to Wisconsin. She testified that she worked a total of one month in two years she resided in Memphis while the children were in custody. The mother did provide information that she was currently attending a job training program and is employed in Wisconsin. The Court applauds the mother's present commitment to improve her situation, but cannot find that this represents stable employment.

The court finds that the mother did not maintain contact with her children. Her last visit, in August, 2002. [sic] The mother has not seen her children for almost nineteen months prior to the first day of trial. She did not call them, or send any letters. She did not attempt to have the order suspending her visitation changed. The mother has never paid any child support. The Court finds that the mother was not compliant with these requirements.

The Court finds by clear and convincing evidence that grounds exist for the termination of parental rights as to the mother under T.C.A. § 36-1-113(g)(3). It is undisputed that the children have been removed for a period of six months. The conditions which led to the children's removal include the mother's unwillingness

to parent the children and take care of them physically, financially, and emotionally. Although the mother has made some steps to improve her situation, she has not even finished her parenting classes in over two years. She has not provided any proof that she has addressed the basic issues of parenting and caring for her children. She admitted that it may take her a long time before she finishes "getting herself together" and is able to care for the children. The Court finds that these conditions will not be remedied at an early date. Finally, the Court finds that these children need permanency, and the continuation of the parent/child relationship greatly diminishes these children's chances of achieving a permanent home through adoption.

The court made the following specific findings with regard to the putative father:

The Court finds by clear and convincing evidence that grounds exist as to the father for Termination of Parental Rights under T.C.A. § 36-1-113(g)(1) due to his willful failure to visit. It was undisputed that the father has not visited [D.M.S.], or the other children for a period of four months prior to the filing of the Petition to Terminate Parental Rights. The father testified that the mother told him at [D.M.S.]'s birth that he was the father. Then the father testified that the mother told him he was not [D.M.S.]'s father, and that he had no idea he might be [D.M.S.]'s father until about the time the termination petition was filed. He testified that he visited [D.M.S.] when [D.M.S.] was a baby. Then he testified that he had not seen [D.M.S.] since the day [D.M.S.] was born.

The Court finds that [J.M.L.]'s testimony was contradictory, to say the least, and finds that he lacks credibility. It was undisputed that [J.M.L.]'s mother filed for custody of the children in 2002. The Court does not believe that [J.M.L.] was without knowledge that he had a son, or that his son was in DCS custody. [J.M.L.] never made any attempt to contact DCS and inquire about visiting [D.M.S.]. The Court finds that [J.M.L.]'s willful ignorance of the situation constitutes a willful failure to visit.

The Court finds by clear and convincing evidence that grounds exist as to [J.M.L.] for Termination of Parental Rights under T.C.A. § 36-1-113(g)(8) in that he has failed without good cause or excuse to pay a reasonable share of prenatal, natal and postnatal expenses involving the birth of a child. [J.M.L.] was informed that he was the father of [D.M.S.] at the birth of the child, and visited the child for sometime after the birth. [J.M.L.] admitted he did not pay any prenatal, natal, or postnatal expenses. He did not provide any credible reason why he did not assist.

The Court also finds that [J.M.L.] has not sought visitation with the child since the child was an infant. The caseworker testified that he had at least three telephone contacts with [J.M.L.] in May, July, and November of 2003 and informed [J.M.L.] that he needed to establish paternity for [D.M.S.]. [J.M.L.] was not

established as the legal father of [D.M.S.] at the time of trial. [J.M.L.] did not file a petition to establish paternity for [D.M.S.] or any of the other children.

Consistent with the requirements of Tennessee Code Annotated section 36-1-113, the court made the following specific findings regarding best interests of the children:

The Court finds by clear and convincing evidence that it is in the best interests of the children that respondents parental rights be terminated. The court has considered the factors found in T.C.A. 361-113(I), and finds as follows:

The mother has had over two years to complete the permanency plan. She has lived in a number of residences, has been unemployed for much of that time, and has not attended counseling or therapy to deal with the issue of abandoning her children. She has not made an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. The other respondents have never acted in the parenting role to these children. [J.M.L.] decided not to come forward and attempt to gain custody of any of the children until the trial date, even though he had information that at least one of the children was his.

The Department of Children's Services has made reasonable efforts to assist the mother with the services she needs. The casemanager offered the mother help in Nashville, Memphis, and Wisconsin in completing the permanency plan. The casemanager made numerous attempts to assist the mother. The mother refused the help and stated that she would do it on her own. She did not. After two years the mother has finally started making minimal progress on some of the permanency plan items. However, it does not appear to the Court that lasting adjustment is possible. [J.M.L.] was requested numerous times to establish paternity for [D.M.S.]. He did not. The other respondents did not appear during the time the children were in custody.

None of the respondents has maintained regular visitation or other contact with the children. [J.M.L.] has not seen [D.M.S.] since infancy. The mother has not seen the children in almost two years. Because of this lapse in visitation, there is not a meaningful relationship established between the mother and her children. The children do not know their biological mother in a meaningful way.

The children have been in the same foster homes for a lengthy period of time. They are receiving the services, care and attention that they require. At one time, the casemanager sent the mother an authorization form for [D.M.S.]'s medication for mental health issues. She refused to authorize the medications. [J.M.L.], who has never seen [D.M.S.], testified that he thought [D.M.S.] did not need any medication. The court is concerned that the mother and [J.M.L.] would not continue to meet

[D.M.S.]'s medical needs if they were to be caretakers. None of the children has seen their mother in approximately two years. To remove them from stable foster homes to unknown parent(s) would have a detrimental impact on their emotional health.

Although the children came into custody with scars and lacerations, there were no allegations of abuse against respondents. The mother has not asked the department to do a study on her home, nor has she provided any evidence that her home in Wisconsin is healthy and safe, so the Court cannot find that the physical environment of the mother's current home is a suitable environment for the children.

The Court has great concern regarding the mother's mental status regarding the children. The children were brought into custody due to abandonment by the mother. The mother has not addressed these issues through therapy or counseling. She has taken two parenting classes. The Court finds that returning the children to the mother would be detrimental to the children because she has not gotten help on these issues.

None of the respondents has paid child support in accordance with the child support guidelines.

The Court finds that it is in the best interests of the children for the parental rights of respondents to be terminated.

From this Order, Mother appeals challenging the court's finding of clear and convincing evidence supporting the statutory grounds and its determination of the children's best interests. Appellant putative father, J.M.L., challenges the trial court's determination that clear and convincing evidence supported grounds for terminating his parental rights.

Before proceeding to each parent's issues on appeal we reiterate the well-settled standards applicable to the review of orders terminating parental rights.

In reviewing termination decisions, this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn.Ct.App. May 26, 1999) (*no perm. app. filed*); *Department of Children's Servs. V. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar. 24, 1998) (*no perm. app. filed*); *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any of the bases found by the trial court. *See M.C.G.*, 1999 WL 332729, at *5; *Darr*, 1998 WL 128874, at *3; *Manier*, 1997 WL

675209, at *5; *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn.Ct.App. Mar. 27, 1998) (*no perm. app. filed*).

This court recently attempted to describe the clear and convincing evidence standard, explaining that

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn.App.1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*M.C.G.*, 1999 WL 332729, at *6 (quoting *Bingham v. Knipp*, No. 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn.Ct.App. Feb. 23, 1999) (*no perm. app. filed*)).

*In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473-74 (Tenn.Ct.App.2000).

It is well settled that the right to custody and control of one's children is fundamental but not absolute. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn.2002). *See also In Re M.J.B. and M.W.S., Jr.*, 140 S.W.3d 643, 653, n. 31 (Tenn.Ct.App.2004) (The rights of a biological parent exists not withstanding marital status.) . If the proof before the trial court eliminates any serious doubt as to any one of the statutory grounds cited by the trial court, then the order is to be affirmed.

## I. MOTHER'S ISSUES

### A. Abandonment

Tennessee Code Annotated section 36-1-102 provides:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have <u>willfully</u> failed to visit or have willfully failed to support or have <u>willfully</u> failed to make reasonable payments toward the support of the child;

> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

Tenn.Code Ann. §36-1-102. (emphasis added)

Mother argues that her failure to visit or support her children was not willful in nature. The totality of the circumstances presented to the trial court clearly and convincingly show that, while the incident which led to the emergency placement of the children might be characterized as less than willful, given the illness of her own mother, the continued absence of this mother from this State's jurisdiction was unexplained. The Department attempted to assist Mother in finding stable housing

and attempted to ascertain whether she was steadily and lawfully employed.[2]  These attempts were no doubt frustrated by Mother's move to another state some 500 plus miles away.

## A.  Visitation

The proof in the record reveals that, while the mother lived in Memphis, a male friend there would assist her in visiting her children in Nashville.  When this relationship deteriorated, the mother did not return to Nashville to be close to the children and, likewise, be in a better position to visit them.  Instead, she decided to travel back to Wisconsin, where another of her male friends lived with his mother.  It bears noting that after August 27, 2002, the mother did not visit these children and made no such request until after the juvenile court had already suspended visitation rights.

## B.  Support

The mother next argues that her failure to provide support does not rise to the willful nature required by the statute.  The only Permanency Plan in which the mother participated, which bears her signature, required the payment of twenty-one percent (21%) of her income in child support.  This very Plan indicated that at the time of staffing she was employed at Home Depot.  She has long since departed that job.  Though the mother testified to enrolling in Wisconsin's "W-2 Project" in order to find a better employment position, these efforts are indeed far removed from the relevant time period.  She is currently employed as a secretary in Wisconsin.  Nonetheless, Mother argues that her reason for not supporting the children is that "no one really, really told me I had to pay child support."  Mother did not seek employment in Tennessee.  Mother voluntarily left the jurisdiction.  Mother has paid absolutely no child support and provided no valid reasons for the failure to support.  The trial court found willful failure to support, and our review of the record confirms this finding as supported by clear and convincing evidence.  On appeal, Mother argues that intervening jail time prohibited her from otherwise complying with the support requirement.  This argument flies in the face of her own testimony at trial:

> Q.  You just testified that you were incarcerated in 2001.
>
> A.  No.
>
> Q.  Right after the children came into custody?
>
> A.  That's when I was here.  They had took me to jail when I went to visit the kids they locked me up.

---

[2]The testimonial record as well as the Permanency Plans suggests that when the children initially came into custody, the Department had reason to believe that Mother was involved in prostitution.  The record on appeal is devoid of any proof regarding the resolution of this charge other than the Permanency Plans which contain, as one of the goals, to complete the investigation into allegations of prostitution.

Q. Is that from the charge that you just testified to?

A. Yes.

Q. How long a sentence did you serve in 2001?

A. For the first court that we had, I got out, that date of court.

Q. So approximately a month?

A. Yes.

Q. And then you were rearrested?

A. Yes.

Q. In Wisconsin?

A. Yes.

Q. When were you rearrested?

A. Towards Thanksgiving time.

Q. Of what year?

A. '93, '92. Not '92.

Q. 2002?

A. I'm not sure. I can't – – I'm sorry, but I'm not sure. But I know it was during Thanksgiving time.

Q. And how long were you incarcerated that time?

A. For a week.

Q. Why did you not visit your children from August the 27th, 2002, until the Court said it was going to suspend your visitation?

A. Well, when I talked to Tom prior to then and I told Tom that by me living in Memphis and I really didn't have a way – – people – – I was having people bring me to see my children.

-13-

Q. I thought you were living in Milwaukee – –

A. No.

Q. – – at this time.

A. What month did you say?

Q. From August the 27th, 2002 until the Court suspended your visitation in April of 2003, why did you not visit your children?

A. It's obvious. I did not have a way up here. And I'm all the way in Milwaukee now, all the way here, I mean, down here in Tennessee. I don't have very much family neither to, you know, bring me and do stuff for me. It's just me.

Mother seems to suggest by this testimony that the choice to live so far away from these children was not her own choice. On the contrary, her relocation as well as her duties as a parent are her responsibilities and hers alone.

C. Substantial Noncompliance

Of the several grounds alleged in the State's Petition, and found by the trial court, the mother also challenges the finding of substantial noncompliance with the Permanency Plan. *See* Tenn.Code Ann. § 36-1-113(g)(2). Pursuant to the initial Permanency Plan provisions, the mother was required to obtain adequate living quarters. At the time of this initial Plan, the mother was alleged to be engaged in prostitution; therefore, the Plan required the allegations to be investigated.

This Plan was revised in May of 2002. The revised Plan in which the mother participated required completion of parenting classes by November 2002, maintenance of stable employment and adequate living quarters by November 2002. The revision in April of 2003 continued the requirement of stable housing, stable employment and completion of parenting classes. The trial court specifically found that Mother's testimony regarding her residence lacked credibility. This case does not second-guess such credibility determinations. *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App.1998). In addition, the court never received any proof that Mother had completed parenting classes prior to the first day of the hearing on the State's Petition.

At the time the children came into DCS custody, Mother was not in this jurisdiction. She had no verifiable home place throughout the children's stay in the foster system. The trial court found that the absence of legitimate employment and stable residence were reasonably related to the removal of the children and the goal of reunification. *See* Tenn.Code Ann. § 37-2-403(a)(2)(C). Even crediting Mother's testimony regarding her eventual month-to-month lease of a residence in Milwaukee, the proof shows that for the vast majority of these children's stay in foster care, Mother

continued and remains in substantial noncompliance with the Plan. *See In re Valentine*, 79 S.W.3d 539, 546-47 (Tenn.2002).

### D. Persistence of Conditions

The abandonment of these children by the mother, the condition the children were in when turned over to DCS custody, and the failure of the mother to identify herself until January 2003 all support the trial court's conclusion that the mother was unwilling to take care of these children physically, financially or emotionally. Even at the conclusion of her testimony, Mother admitted her continued inability to provide the care and support these children require. The record is replete with proof that although the mother had made efforts to obtain the requisite stable employment and housing, these efforts were not made until well after the filing of the State's Petition. The court was presented with ample proof that these conditions, in all probability, will continue and lead to further neglect and dependence and prevent the children's safe return. *See* Tenn.Code Ann. § 36-1-113(g)(3)(A).

## II. FATHER'S ISSUES

For his part, Father of D.M.S. challenges the trial court's termination of his parental rights as unsupported by clear and convincing evidence. Likewise, Father challenges the trial court's conclusion that termination of his parental rights is in the child's best interest. At the outset of the analysis of Father's issues on appeal, we note that the trial court determined Father's testimony lacked credibility as to what he knew or did not know about the parentage of the child in question. The record on appeal clearly shows that Father, despite the probability of natural parentage, willfully failed to visit this child and likewise failed to pay any costs associated with the child's birth. D.M.S. has not known his natural father until the beginning of this proceeding to terminate Father's rights. As has been stated herein with regard to the Mother, the right to care and custody of a child is fundamental. While courts should be loathe to interfere with these rights absent a clear and convincing showing that the best interest of the child requires such interference, parents who do nothing more than provide the genetic material necessary to establish parentage via DNA testing, and yet have taken no steps to nurture or support the child for the statutory period have forfeited any parental rights. The trial court's findings as to the best interest of D.M.S. and its termination of Father's parental rights are affirmed in all respects.

## III. BEST INTEREST

Under the facts as presented to the trial court, neither party, least of all the mother, can mount a serious challenge to the trial court's finding that termination of parental rights is in the children's best interest. *See* Tenn.Code Ann. § 36-1-113(a)(1-9). Though the statute by its terms is not limited to the factors enumerated, each of the factors listed clearly and convincingly weighs in favor of termination.

Having addressed the issues of both parents, this Court finds that the trial court's judgment should be affirmed in all respects. The case is remanded for further proceedings consistent herewith.

Costs of the appeal are assessed against the appellants equally.

_____
WILLIAM B. CAIN, JUDGE