# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

# In re C.W.W., N.W.W., Z.W.W., & A.L.W.

### Direct Appeal from the Juvenile Court for Davidson County
### Nos. 9619-30653, 9619-30651, 9619-30649, 9819-42670    Betty Adams Green, Judge

---

### No. M1999-01372-COA-R3-CV - Decided May 23, 2000

---

Christine Stroth Wideman (Mother) appeals the trial court's judgment terminating her parental rights to three of her children, C.W.W., N.W.W., and Z.W.W. The Department of Children's Services (DCS) obtained custody of these children for the second time in February 1998. Several days earlier, the Mother instructed the children to go to a neighbor's house for a few hours. When the Mother did not return for the children, school officials notified DCS that the children had been abandoned. The Mother was arrested and incarcerated on March 31, 1998, on prostitution and other charges. In November 1998, approximately one month after her release, DCS filed this petition to terminate the Mother's parental rights. At the trial's conclusion, the trial court entered a final decree terminating the Mother's parental rights based upon the court's findings that the Mother had abandoned the children and that the conditions which led to the children's removal still persisted. We affirm the trial court's judgment based upon our conclusion that the record contains clear and convincing evidence to support the trial court's findings that the Mother abandoned the children by engaging in conduct prior to her incarceration which exhibited a wanton disregard for the children's welfare and that termination of the Mother's parental rights was in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; and Remanded**

FARMER, J., delivered the opinion of the court, in which CRAWFORD, P.J.,W.S., and LILLARD, J., joined.

Jennifer Lynn Thompson, Nashville, Tennessee, for the appellant, Christine Shroth Wideman.

Dennis L. Nordhoff, Franklin, Tennessee, for the appellant, Christopher Wayne Wideman.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Stephanie Cantrell Hatchett, Nashville, Tennessee, for the appellees, Jamie and Jorge Flores.

# OPINION

The children first came into the custody of the Department of Children's Services (DCS) in November 1996. The trial court subsequently entered an agreed order finding the children to be dependent and neglected because of the crack cocaine addictions of their parents, Christopher Wayne Wideman (Father) and Christine Stroth Wideman (Mother). The trial court's order indicated that the parents pled guilty to charges of criminal neglect involving the children. The order also indicated that the children would not be returned to the parents until the parents successfully completed treatment for their drug addictions.

On November 3, 1997, the trial court transferred legal custody of the children back to the parents. In its order transferring custody, the trial court found that the parents had undergone three negative drug screens since the last court hearing. The trial court also found that the parents were attending Narcotics Anonymous meetings three times per week and that the Father was employed in a drywall job.

Three months later, on February 3, 1998, DCS again petitioned the court for custody of the children. The petition alleged that the Mother left the children with a neighbor on Friday, January 30, 1998, and had not returned home or contacted the children. The petition further alleged that the parents had relapsed and that they were using drugs and neglecting the children again.

The trial court ordered that legal custody of the children again be placed with DCS. The court noted that

> this is the children's second stay in foster care and the apparent relapse of the parents is quite serious. The boys have counted on their [parents'] rehabilitation and the effect on them is potentially very serious.

In March 1998, the trial court entered an order finding the children to be dependent and neglected for the second time and ordering DCS to retain custody of the children. In support of its decision, the trial court made the following findings:

> [T]he Mother sent the children to the home of Rita Moore, a neighbor whom the Mother had never met, on Friday, January 30, 1998, for Ms. Moore to watch them for a few hours. Ms. Moore kept the children until Monday, February 2, 1998, and still had not heard from the Mother. The Father was incarcerated. Ms. Moore took the children to school and told the school officials what had happened. The school officials called the Department and the children were taken into custody on an emergency basis. The Mother has not contacted Ms. Moore by phone or in person since January 30, 1998, to inquire about the whereabouts and safety of her children.
>
> The trailer inhabited by the Wideman family was in a filthy condition with food molded in the refrigerator and no fresh food being in the house. Dirty clothing

was piled high in the bathroom and the house stank. The water and electricity were still on in the trailer because utilities are included in the rent. The toilet was not in working order and had not been flushed in some time. There was a crack pipe, razor blades, and Chore Boys in a metal cookie container in the Mother's dresser and [dildos] lying around the bedroom in plain sight. There were also boxes of baking soda and razor blades in close proximity in the house.

The Mother was . . . seen the week of February 8th, 1998, on Dickerson gesturing in a sexually suggestive manner to male passersby. The Mother was seen in the company of one man not her husband in the vicinity of Dickerson Road and Old Trinity Lane. During the first week of February, the Mother was seen on another occasion at a local market at which time she appeared to be under the influence of alcohol and perhaps some other substance. Her speech was slurred and she was staggering. The Mother was informed by the neighbor that her children had been taken into custody.

. . . [W]hile the family was still intact, the children appeared in the neighborhood oftentimes with dirty clothing, unclean faces, and dirty, oily hair. The parents were never seen supervising the children while they were out playing in the neighborhood.

[DCS] provided rehabilitative services for the parents when the children were in foster care from November 1996 to November 1997 and . . . the parents at that time appeared to have bettered themselves by gaining employment and housing. However, that progress was short lived and any progress the parents made was lost shortly after the Court returned the children to the parents.

On March 31, 1998, the Mother was arrested and incarcerated because of prostitution and other charges. In July 1998, while she was still incarcerated, the Mother gave birth to a fourth child, A.L.W. The Mother agreed to place custody of A.L.W. with Jamie and Jorge Flores. After her release in October 1998, the Mother requested visitation with the children, and her request was granted.

In October 1998, the Floreses filed a petition in which they asked the court to terminate the Mother's and the Father's parental rights to A.L.W. The following month, DCS filed a petition asking the trial court to terminate the Mother's and the Father's parental rights to their three older children, C.W.W., N.W.W., and Z.W.W. DCS's petition alleged that the parents had abandoned the children pursuant to Tennessee Code Annotated section 36-1-102(1)(A), subsections (i) and (iv). *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (iv) (Supp. 1998). Alternatively, DCS's petition alleged that, pursuant to section 36-1-113(g)(3)(A), the children had been removed from the parents' home for more than six months, the conditions which led to their removal still persisted, there was little

likelihood that these conditions would be remedied at an early date so that the children could be returned to the parents in the near future, and the continuation of the parent and child relationship greatly diminished the children's chances of early integration into a stable and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 1998).

In February 1999, the trial court conducted a trial on both DCS's petition and the Floreses' petition. The evidence at trial showed that the parents' drug addictions predated their children's births and caused problems throughout their relationship. The Mother began engaging in prostitution to support the couple's drug habits when they lived in Detroit, Michigan, in the early 1980's. After leaving Detroit, the couple moved to Orlando, Florida, where their first two children were born. C.W.W. was born in August 1984. N.W.W. was born almost two years later, in April 1986. The family later moved to Nashville, Tennessee, where Z.W.W. was born in October 1991. At some point, however, the family returned to Florida to live.

In 1996, the family moved back to Nashville. Earlier that year, the children went to live with the Father's sister and mother in Georgia. According to the Father, his sister and mother agreed to care for the children because the Father and the Mother became ill and could not work. The Father described this illness as "like a stomach flu and virus, something that happened." After about six months, the Father and the Mother joined the children in Georgia. The Father explained that the family moved to Nashville after the Father had a dispute with his mother over her demand that he pay some of the household bills.

After moving to Nashville, the family lived in a motel for a few months. By this time, the Mother had resumed engaging in prostitution to support the couple's drug addictions. The Father supported the Mother's decision to make a living as a prostitute, and, in fact, he admitted that he pressured her to do so. When the couple's drug-related activities required them to be away from the children, they asked other motel residents to look after the children. The couple's neglect of the children during this time led to DCS's first involvement with the family.

As previously indicated, in November 1997, after the Father obtained employment and both the Mother and the Father underwent three negative drug tests, the trial court transferred custody of the children back to the parents. The family moved into a rented trailer in a trailer park. Unfortunately, the couple's progress was short-lived. Within a couple of weeks, both the Mother and the Father began using drugs again, and the Mother resumed engaging in prostitution to support the couple's drug habits. In December 1997, the Father lost his drywall job. Just before Christmas, the parents pawned some of C.W.W.'s possessions for money to buy food and drugs.

The couple's activities again resulted in their extended absences from home. The Mother often left home for hours or days at a time. When the Mother did not return, the Father would leave the home to search for her. During this time, the couple's oldest son, C.W.W., attempted to care for his younger brothers by waking them for school each morning and finding food for them to eat.

One afternoon late in January 1998, the Mother instructed C.W.W. and his brothers to go to

-4-

a neighbor's house until 7:00 p.m. When the Mother did not return home, C.W.W. broke into the family's rented trailer to obtain clothing, and he returned to the neighbor's home. The following week, the neighbor notified school officials that the Mother had not returned for the children, and the school officials contacted DCS. Shortly thereafter, the trial court granted DCS's petition to regain custody of the children.

The Mother did not attempt to contact DCS or the children until after her arrest in March 1998. By this time, the Mother was pregnant with her fourth child, A.L.W. While in jail, the Mother went through a drug treatment program. After her release in October 1998, the Mother continued her treatment for drug addiction by entering a ninety-day treatment program at the Women's Center in Nashville. The Mother later entered the Magdalene program, a program designed to help women with histories of drug addiction and prostitution. The Mother lived in one of the Magdalene program's two residences with several other women.

By the time of trial in February 1999, the Mother had made significant progress in her treatment for drug addiction. All of the drug screens taken by the Mother since entering treatment were negative. Sara Martin, the social worker who directed the Magdalene program, testified that the Mother was highly motivated, had "come a long way," and was "a wonderful asset to [the] program." Linda Hazel, the director of the Women's Center where the Mother still participated in aftercare, also attested to the Mother's progress. Dr. Hazel testified that the Mother had complied with all treatment program requirements and rules, that she consistently attended her aftercare and individual therapy sessions, and that her prognosis for recovery was "extremely good." Dr. Hazel attributed this progress, in part, to the Mother's strong desires to have a lifestyle free of drugs and alcohol and to have her family back together.

The Mother acknowledged that her previous problems with drug abuse and prostitution caused her to neglect her children. The Mother also acknowledged that the treatment program in which she was participating was scheduled to last two years and, thus, that she could be living in one of the Magdalene program's houses for another nineteen months. Although the children could visit the Mother and stay with her on weekends, the Magdalene program did not permit the children to live with the Mother while she was living in one of the program's houses. The Mother planned to obtain employment, and she hoped to attend nursing school so that she could become a licensed practical nurse. At the time of trial, however, the Mother was not working, and her only source of income was a $60 weekly stipend that the Magdalene program paid to new residents. The Mother admitted that she had paid no support for her children since DCS obtained custody of them. The Mother was unable to specify when she could support the children or provide a home for them.

At the trial's conclusion, the trial court entered an order sustaining both of the grounds for termination alleged in DCS's petition. Based upon its finding that terminations of the Mother's and the Father's parental rights were in the children's best interests, the trial court granted DCS's petition and the Floreses' petition. The court awarded custody of A.L.W. to the Floreses, and it awarded custody of the three older children to DCS.

Both the Mother and the Father appealed the trial court's final decree terminating their parental rights. In the brief filed by the Father in October 1999, the Father did not contest the trial court's finding that he had abandoned the children. Instead, the Father argued that the trial court erred in terminating the Mother's parental rights. The Father hoped that, if the Mother's parental rights were restored, the Father would be permitted to visit the children even though his own parental rights had been terminated.

In her brief, the Mother raised the following issues:

I.      Whether the trial court erred in terminating [the] parental rights of [the Mother] by finding that the statutory requirements for termination had been met?

     A.      Whether the trial court erred in finding that the Mother, . . . had willfully failed to visit, support or make reasonable payments toward the support of the children in the four months prior to [her] incarceration or that prior to [her] incarceration she exhibited a wanton disregard for the welfare of the children.

     B.      Whether the trial court erred by finding that there was a persistence of conditions that led to the removal [of the children] and [that] there was little likelihood that the conditions would be remedied at an early date?

II.     Whether the trial court erred by finding that it was in the children's best interest to terminate [the Mother's] parental rights.

At oral argument, the Mother moved to dismiss her appeal of the trial court's termination of her parental rights to the youngest child, A.L.W.[1] This court subsequently entered an order granting the Mother's motion and dismissing her appeal as to A.L.W. Thus, the issues before this court involve only the trial court's termination of the Mother's parental rights to the three older children, C.W.W., N.W.W., and Z.W.W.

We begin our analysis with the well-established premise that "[a] parent has a fundamental

---

[1]We note that the guardian *ad litem* for the children filed a joint brief with the Floreses' attorney. In a termination of parental rights case, a guardian *ad litem*'s function is "to represent the best interests of the child." Tenn. R. Juv. P. 39(e); *see also* Tenn. R. Juv. P. 2(7) (defining guardian *ad litem* as "a responsible adult who is appointed by the court to protect the rights and interests of a child during the pendency of a proceeding involving the child and to advocate for the best interests of the child"). We recognize that sometimes a child's best interests may coincide with the interests of another party. Nevertheless, the guardian *ad litem* should strive to perform his or her function independently of other parties to the litigation. *See Gann v. Burton*, 511 S.W.2d 244, 246 (Tenn. 1974); *Harper v. Watkins*, 670 S.W.2d 611, 627 (Tenn. Ct. App. 1983); *Knight v. Knight*, 458 S.W.2d 803, 806 (Tenn. Ct. App. 1970).

right to the care, custody and control of his or her child." ***Department of Children's Servs. v. Wiley***, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *3 (Tenn. Ct. App. Nov. 24, 1999), ***perm. app. denied*** (Tenn. Apr. 24, 2000) (citing ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972)). This right, however, is not absolute. A parent's right to the care, custody, and control of his or her child may be terminated if clear and convincing evidence justifies such termination under the applicable statute. ***See Wiley***, 1999 WL 1068726, at *3 (citing ***Santosky v. Kramer***, 455 U.S. 745, 769 (1982)).

In the present case, the trial court terminated the Mother's parental rights based upon the following provisions of Tennessee's adoption statutes:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> . . . .
>
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g) (Supp. 1998). Regarding the first ground, Tennessee's adoption statutes define abandonment as

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully

failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

. . . .

(iv)    A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 1998).

In reviewing termination decisions, this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn. Ct. App. May 26, 1999) (*no perm. app. filed*); *Department of Children's Servs. v. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn. Ct. App. Mar. 24, 1998) (*no perm. app. filed*); *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any of the bases found by the trial court. *See M.C.G.*, 1999 WL 332729, at *5; *Darr*, 1998 WL 128874, at *3; *Manier*, 1997 WL 675209, at *5; *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn. Ct. App. Mar. 27, 1998) (*no perm. app. filed*).

This court recently attempted to describe the clear and convincing evidence standard, explaining that

[a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the

evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. ***Lettner v. Plummer***, 559 S.W.2d 785, 787 (Tenn. 1977); ***Goldsmith v. Roberts***, 622 S.W.2d 438, 441 (Tenn. App. 1981); ***Brandon v. Wright***, 838 S.W.2d at 536.

***M.C.G.***, 1999 WL 332729, at *6 (quoting ***Bingham v. Knipp***, No. 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn. Ct. App. Feb. 23, 1999) (***no perm. app. filed***)).

After carefully reviewing the evidence presented in this case, we conclude that clear and convincing evidence supports the trial court's termination of the Mother's parental rights based upon the court's finding that the Mother abandoned C.W.W., N.W.W., and Z.W.W. Because the Mother was incarcerated for a portion of the four months immediately preceding DCS's institution of this termination action, the statutory definition of abandonment contained in section 36-1-102(1)(A)(iv) applied to this proceeding. In order to establish an abandonment under that section, DCS was required to show that, for a period of four consecutive months immediately preceding her incarceration, the Mother engaged in at least one of the following actions: (1) willfully failed to visit the children; (2) willfully failed to support the children or to make reasonable payments toward the children's support; or (3) engaged in conduct that exhibited a "wanton disregard" for the children's welfare. ***See*** Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 1998).

In the present case, the evidence showed that the Mother was incarcerated from March 31, 1998, to October 8, 1998. Thus, the critical period for determining whether the Mother abandoned the children was the four-month period immediately preceding March 31, 1998, ***i.e.*** from November 30, 1997, to March 31, 1998. ***See*** Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 1998).

The record indicated that the children were returned to the Mother's and the Father's custody on or about November 3, 1997. Within a few weeks, however, the Mother and the Father were using drugs again. The parents' relapses resulted in their extended absences from home as the Mother again engaged in prostitution to support the couple's crack cocaine habits. At times, the parents left the children alone in the family's rented trailer with very little food or clean clothing. During his parents' absences, C.W.W. tried to take care of his two younger brothers, awakening them for school and seeing that they had food to eat. On a couple of occasions, C.W.W. went around the neighborhood looking for food for himself and his brothers.

In January 1998, the Mother left the children with a neighbor and failed to return to reclaim them. The Mother continued to engage in prostitution and to use illegal drugs. The Mother made no effort to contact DCS or to locate the children until after her arrest on March 31, 1998. At trial, the Mother acknowledged that she did not treat the children the way they deserved to be treated. The Mother also admitted that the behaviors that led to her arrest and incarceration were undertaken "with total disregard for [the] children."

Like the trial court, we conclude that the Mother's conduct in the four-month period immediately preceding her incarceration exhibited a wanton disregard for the welfare of her children.

Our conclusion is supported by other decisions of this court which have held that a parent's drug habit and related criminal activity constituted conduct exhibiting a wanton disregard for the parent's children. In *Department of Children's Services v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999), ***perm. app. denied*** (Tenn. Apr. 24, 2000), for example, the father "admitted that he was addicted to cocaine and that his need for money to support his habit led him to commit several burglaries and thefts" that resulted in his incarceration. This court held that the Father's conduct demonstrated his wanton disregard for the welfare of his children. *See Wiley*, 1999 WL 1068726, at *7.

In *Department of Children's Services v. Osborne*, No. 01A01-9810-JV-00564, 1999 WL 557543, at *6 (Tenn. Ct. App. Aug. 2, 1999) (***no perm. app. filed***), we agreed with DCS's argument that the father's criminal conduct and drug abuse prior to his incarceration evidenced a wanton disregard for the welfare of his daughter. There, the father "testified that he did not think that abusing drugs indicated abuse or neglect for a child's welfare." *Osborne*, 1999 WL 557543, at *6. The father admitted, however, that he had engaged in "chronic drug abuse and criminal conduct" and that "he had no home to provide for his daughter." *Id*.

In *In re Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997) (***no perm. app. filed***), the father admitted that his drug and alcohol problems contributed to his violent conduct toward his ex-wife, the children's mother. The father also had engaged in criminal conduct that resulted in his third incarceration. *See Shipley*, 1997 WL 596281, at *5. This court held that the father's criminal conduct, coupled with his drug and alcohol problems, showed a wanton disregard for the welfare of his children prior to his incarceration. *See id*.

In light of our affirmance of the trial court's ruling on the issue of abandonment, we need not address the Mother's contention that the trial court also erred in terminating her parental rights based upon the court's finding that the conditions which led to the children's removal still persisted and that there was little likelihood that these conditions would be remedied at an early date. We will address, however, the Mother's final issue whereby she contends that the trial court erred in finding that termination of her parental rights was in the children's best interests.

In order to terminate a parent's rights to his or her child, the trial court must make two findings. The court first must find, by clear and convincing evidence, that one of the asserted grounds for termination has been established. *See* Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 1998). Once the court has made this finding, the court additionally must find that termination of the parent's rights is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1998).

In making this best-interests determination, the trial court is required to consider, ***inter alia***, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest

-10-

to be in the home of the parent or guardian;

     (2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

     (3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

     (4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

     (5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

     (6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

     (7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

     (8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

     (9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by [DCS] pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 1998).

In finding that termination of the Mother's parental rights was in the children's best interests, the trial court specifically considered factors (1), (2), (5), (7), and (9). With regard to these factors, the trial court found

     [t]hat [the Mother has] failed to make such an adjustment of circumstances, conduct, or conditions as to make it in [the] children's best interests to return to [her] home in the foreseeable future; that [the Mother has] failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible; that [the Mother has] failed to pay a reasonable portion of substitute physical care and maintenance.

-11-

The Court also considers the effect of a change of caretakers and physical environment is likely to have on the [children's] emotional, psychological and medical condition, ( . . . [Z.W.W.] has been in custody or with relatives for approximately 31% of his life); that . . . [the Mother] currently cannot have children live with her at her treatment program which is anticipated to last another nineteen (19) months, and further that [the Mother has] failed to pay child support consistent with the child support guidelines promulgated by [DCS] pursuant to [Tennessee Code Annotated section] 36-5-101 or any offer of support for that matter.

We conclude that the evidence supports the trial court's findings. At the time of trial, the Mother had made significant adjustments in her conduct and circumstances. The Mother had completed five months of a two-year drug treatment program, and, by all accounts, she continued to remain drug-free and to make progress in this program. Nevertheless, by her own admission, the Mother was unable to provide a home for the children at the time of trial, and, except for her testimony that she had nineteen months remaining in the program, the Mother could provide no time frame for providing the children with a home or other support. Although the Mother planned to look for work, she did not have employment at the time of trial, and she had no means of supporting the children beyond the $60 weekly stipend that she received from the Magdalene program. The Mother had not used any of these funds to provide the children with gifts or basic necessities, and she had not offered to pay even token support on behalf of the children. The Mother's only explanation for this failure was that no one ever told her the amount of support she should pay.[2] Under these circumstances, we decline to disturb the trial court's finding that termination of the Mother's parental rights was in the children's best interests.

The trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Christine Stroth Wideman, for which execution may issue if necessary.

---

[2]As we recently observed, "[a] parent has the duty to support his or her child regardless of whether a court order exists requiring the parent to make child support payments." *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *11 n.4 (Tenn. Ct. App. May 26, 1999) (*no perm. app. filed*) (citing *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998)).