IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 15, 2005 Session

**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. TAKETA PURYEAR and JOHNNIE B. McNEAL**

**In the Matter of: C.McN. (d/o/b 4/10/00), J.P. (d/o/b 9/7/01) and J.McN. (d/o/b 12/18/02), Children Under Eighteen Years of Age**

Direct Appeal from the Juvenile Court for Fayette County
No. C-110     Weber McGraw, Judge

No. W2004-02878-COA-R3-PT - March 30, 2005

The Tennessee Department of Children's Services began providing services to the biological parents of three minor children in December of 2000. Eventually, all three children were removed from the home after the juvenile court determined they were dependent and neglected due to the parents' failure to provide for their medical and nutritional needs. The department created a permanency plan for each child calling for the parents to provide adequate housing, provide for the children's medical and nutritional needs, undergo a psychological evaluation and follow through with treatment recommendations, and participate in counseling/parenting classes designed to teach the parents how to adequately provide for their children. The department subsequently filed a petition to terminate the biological parents' parental rights, alleging the grounds of abandonment, substantial noncompliance with the responsibilities in the permanency plans, persistent conditions, and the mother's alleged mental incompetency. Following a trial, the juvenile court entered an order terminating the biological parents' parental rights to their minor children. The juvenile court found that the department proved by clear and convincing evidence that the parents abandoned the children, substantially failed to comply with the responsibilities in the permanency plans, and allowed conditions to persist which made it unsafe to return the children to the parents. In addition, the juvenile court found that terminating the parents' parental rights was in the children's best interest. Only the mother filed an appeal to contest the juvenile court's judgment. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

J. Barney Witherington, IV, Covington, TN, for Appellant

Paul G. Summers, Attorney General and Reporter, Sharon G. Hutchins, Assistant Attorney General, Nashville, TN, for Appellee

# OPINION

## I.
### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Taketa Puryear ("Mother" or "Appellant") and Johnnie McNeal ("Father")[1] are the biological parents of three minor children: C.L.M. (dob: 04/10/2000), J.V.P. (dob: 09/07/2001), and J.L.M. (dob: 12/18/2002) (collectively "the Children"). Mother and Father have been together for approximately eight years and have never married. The Children are all considered special needs children due to their developmental delays.

The Tennessee Department of Children's Services began providing services to the family in December of 2000. C.L.M. and J.V.P. came into the protective custody of the Tennessee Department of Children's Services ("DCS" or "Appellee") on February 5, 2002, after DCS filed a petition alleging these children were dependent and neglected due to the parents' failure to provide for their necessary medical and nutritional needs. In particular, J.V.P. had to be hospitalized for poor weight gain, and DCS alleged the parents failed to take these children to the doctor when they became seriously ill. J.L.M. came into the protective custody of DCS on or around August 1, 2003, after DCS filed a petition alleging this child to be dependent and neglected due to the parents' failure to provide for her medical and nutritional needs as well.

DCS subsequently created a permanency plan for each child. The permanency plans for J.V.P. and C.L.M. required Mother to do the following: (1) provide for the medical and physical needs of each child; (2) provide a safe, stable home; (3) complete a psychological evaluation and follow through with treatment recommendations; and (4) participate in counseling/parenting classes designed to teach Mother how to provide for her children's basic needs, nourishment, and medical care. The permanency plan for J.L.M. called for Mother to do the following: (1) provide for the child's medical and nutritional needs; (2) provide a safe, stable home; and (3) attend parenting classes.

On December 5, 2003, DCS filed a petition in the Juvenile Court of Fayette County, Tennessee, seeking to terminate Mother's parental rights as to J.V.P. and C.L.M. The petition alleged that J.V.P. and C.L.M. had been in DCS custody since their removal in February of 2002. DCS alleged the following as grounds for terminating Mother's parental rights: (1) pursuant to section 36-1-113(g)(1) of the Tennessee Code, Mother's abandonment of these two children; (2) pursuant to section 36-1-113(g)(2) of the Tennessee Code, Mother's substantial noncompliance with the statement of responsibilities in the permanency plans; (3) pursuant to section 36-1-113(g)(3)(A) of the Tennessee Code, Mother's failure to remedy the conditions which led to the removal of these children; and (4) pursuant to section 36-1-113(g)(8) of the Tennessee Code, Mother's mental incompetence. In addition, DCS alleged that, pursuant to section 36-1-113(i) of the Tennessee Code,

---

[1] Father did not file a notice of appeal in this case, therefore, only Mother's parental rights are at issue on appeal.

termination of Mother's parental rights was in the best interest of J.V.P. and C.L.M.  On June 11, 2004, DCS filed an amended petition seeking to terminate Mother's parental rights as to J.L.M. as well.  The amended petition stated that J.L.M. had continuously been in the custody of DCS since August of 2003, and DCS reiterated the grounds for termination listed in the original petition.

Specifically, DCS alleged that, while Mother had completed two sets of parenting classes, she failed to implement appropriate parenting techniques.  While Mother did undergo a psychological evaluation, DCS contended that she failed to follow through with treatment recommendations.  DCS also alleged that she failed to provide a safe, stable home for the Children.  The petition stated that, while DCS attempted to assist Mother with obtaining public housing by providing money for furniture, the lease deposit, and rent for the first month, Mother failed to pay for the utility deposit.  As a result, Mother could not move into the new apartment.  DCS also cited both parents' failure to disclose their prior criminal histories on the housing application which, if disclosed, would have prevented them from qualifying for public housing.  While Mother did consistently visit with the Children while they were in DCS custody, DCS alleged that such visitation amounted to token visitation.  In addition, DCS noted that neither parent paid child support for the children while they were in DCS custody.  Mother filed a response to the petition denying these particular allegations.

The juvenile court conducted a hearing on the petition filed by DCS on June 16, 2004, and entered an order on August 4, 2004, terminating Mother's parental rights to the Children.  The juvenile court found that DCS proved the following grounds for termination by clear and convincing evidence: (1) Mother, pursuant to section 36-1-113(g)(1) of the Tennessee Code, abandoned the Children; (2) pursuant to section 36-1-113(g)(2) of the Tennessee Code, Mother failed to substantially comply with her responsibilities under the permanency plans; and (3) pursuant to section 36-1-113(g)(3)(A) of the Tennessee Code, the conditions which led to removal of the Children or other conditions still persisted, thereby preventing their safe return to Mother.  The juvenile court also found that, pursuant to section 36-1-113(i) of the Tennessee Code, terminating Mother's parental rights was in the Children's best interest.

Mother filed an appeal to this Court presenting the following issues for our review:

I.      Whether the juvenile court erred in finding that DCS proved each ground for terminating Mother's parental rights to the Children by clear and convincing evidence; and
II.     Whether the trial court erred in finding that terminating Mother's parental rights was in the Children's best interest.

For the reasons set forth more fully herein, we affirm the juvenile court's decision in all respects.

# II.
## STANDARD OF REVIEW

"A biological parent's interest in the care, custody, and control of his or her child is among the oldest of the judicially recognized fundamental liberty interests." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Both the United States and Tennessee Constitutions recognize that parents have a fundamental right to the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 754 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993); *Ray*, 83 S.W.3d at 732. However, this is not a right which is entirely immune from state involvement. *In re Drinnon v. Brown*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). A biological parent's rights regarding the custody of minor children will continue so long as the parents have not voluntarily relinquished their rights, abandoned their rights, or engaged in conduct requiring the limitation or termination of their rights. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000).

Proceedings in Tennessee to terminate the parental rights of a biological parent are governed by statute. *See* Tenn. Code Ann. § 36-1-113 (2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *14 (Tenn. Ct. App. Mar. 9, 2004); *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 Tenn. App. LEXIS 415, at *31 (Tenn. Ct. App. June 3, 2003). A party seeking to terminate a biological parent's parental rights must prove two things: (1) the existence of one of the statutory grounds justifying termination by clear and convincing evidence, Tenn. Code Ann. § 36-1-113(c)(1) (2003); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.W.W.*, 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000); and (2) terminating the biological parent's parental rights is in the children's best interests, Tenn. Code Ann. § 36-1-113(c)(2) (2003); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d at 475–76.

Terminating a biological parent's parental rights is a harsh result, Tenn. Code Ann. § 36-1-113(*l*)(1) (2003), therefore, in order to prevent the unwarranted termination of parental rights, the legislature requires the heightened clear and convincing evidence standard of proof. *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474. This Court has previously described the clear and convincing evidence standard in the following terms:

> Evidence that satisfies this heightened burden of proof eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence, *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It should produce in the fact-finder's mind a firm belief or conviction regarding the truth of the allegations sought

to be established. *O'Daniel v. Messier*, 905 S.W.2d [182, 188 (Tenn. 1995)].

*Ray*, 83 S.W.3d at 733. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re C.W.W.*, 37 S.W.3d at 474 (citing *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981)).

Parental termination proceedings, due to their complexity and the gravity of their consequences, require individual decision making. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). When reviewing a lower court's decision to terminate a biological parent's parental rights, we utilize the following standard of review:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re M.J.B.*, 140 S.W.3d at 654 (citations omitted); *see also Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *Ray*, 83 S.W.3d at 733.

## III.
### LAW AND ANALYSIS

### A.
### *Grounds for Terminating Mother's Parental Rights*

On appeal, Mother attacks the juvenile court's findings regarding each ground it relied upon in terminating her parental rights. We must affirm the trial court's decision to terminate Mother's parental rights if the record reveals that any one of the statutory grounds for termination relied on by the juvenile court has been proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.W.W.*, 37 S.W.3d 467, 473–74 (Tenn. Ct. App. 2000).

The trial court found that clear and convincing evidence existed to terminate Mother's parental rights for allowing the conditions which led to the child's removal or other conditions to

persist. Section 36-1-113(g)(3)(A) of the Tennessee Code, commonly referred to as the "persistent conditions" ground, provides as follows:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) in the near future; and
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (2003).

C.L.M. and J.V.P. were removed from Mother's custody and placed into the custody of DCS by the juvenile court on February 5, 2002, and DCS filed the petition to terminate Mother's parental rights as to these children on December 5, 2003. J.L.M. was removed from Mother's custody and placed into the custody of DCS by the juvenile court on or around August 1, 2003, and DCS filed an amended petition to include this child in its request to terminate Mother's parental rights on June 11, 2004. Accordingly, it is undisputed that the Children have been removed from Mother's home by order of the juvenile court for a period of six (6) months.

Termination of parental rights for a parent's failure to remedy the "conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect" and would "prevent the child's safe return to the care of the parent(s)" requires that DCS prove, by clear and convincing evidence, all three factors set forth in section 36-1-113(g)(3)(A) of the Tennessee Code. *In re Valentine*, 79 S.W.3d at 550. On appeal, Mother argues that DCS failed to prove the existence of each of these statutory factors by clear and convincing evidence.

Regarding the first two factors, Mother concedes that, at the time of trial, she did not have a suitable home for the Children. However, she argues that her failure in this regard was due to a lack of reasonable efforts by DCS to assist her in obtaining suitable housing. Particularly, Mother asserts that, pursuant to an order of the juvenile court entered on June 9, 2003, DCS was required to provide her with a utility deposit in the amount of $220.00 for her new apartment. According to Mother, had DCS done so, there is a "strong likelihood" that she would have been able to remedy the lack of suitable housing.

Cynthia McLain ("Ms. McLain") was the DCS caseworker assigned to this family from February 2002 until June 2004. In May of 2003, Ms. McLain secured an application for "Section-8" housing at the West View Manor Apartments.[2] Ms. McLain met with Mother and Father to go over the application and entered their responses. She also filed a request with DCS for $899.00 to buy furniture for the new apartment, pay for the down payment on the lease, and provide the first month's rent. During their meeting, Ms. McLain informed Mother that DCS would not provide the deposit necessary to have the utilities turned on at the apartment and Mother and Father would be responsible for that fee. Ms. McLain testified that Mother and Father agreed to this arrangement. In fact, when asked during the trial about this agreement, Mother stated that she understood that she and Father would be responsible for paying the utility deposit. Since they had approximately one month before they could move in, Ms. McLain even offered to hold Mother's monthly check to ensure that she would have sufficient funds to pay the utility deposit when the time came.

Following a hearing on May 21, 2003, the juvenile court entered an order on June 9, 2003, which stated that "[a]n apartment for the family will soon be available at West View Cove [sic] and the Department of Children's Services will provide financial assistance for the utility hookups and to purchase beds for the children." Mother alleges that, subsequent to the court's order, she expected DCS to pay for the utility deposit. On June 10, 2003, Ms. McLain took Mother and Father to view their apartment, however, the housing never materialized. Vicky Bushears ("Ms. Bushears"), manager of the West View Manor Apartments, testified that she had an apartment ready for Mother and Father to occupy at a rental rate of $33.00 per month. However, they were unable to move into the new apartment because the utility deposit had not been paid. Ms. Bushears stated that Mother and Father were subsequently moved to a waiting list, but she moved them to an inactive list when the deposit was never paid.

---

[2] The housing provided by the West View Manor Apartments, referred to as "Section 8" housing, is part of a federal program described as follows:

> In 1974, Congress amended the United States Housing Act of 1937 (Housing Act) to create what is known as the Section 8 housing program. Through the Section 8 program, Congress hoped to "aid low-income families in obtaining a decent place to live," 42 U.S.C. § 1437f(a) (1988 ed., Supp. III), by subsidizing private landlords who would rent to low income tenants. Under the program, tenants make rental payments based on their income and ability to pay; the Department of Housing and Urban Development (HUD) then makes "assistance payments" to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. As required by the statute, this contract rent is, in turn, to be based upon "the fair market rental" value of the dwelling, allowing for some modest increase over market rates to account for the additional expense of participating in the Section 8 program. See § 1437f(c)(1).

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12 (1993).

Our review of the testimony of Ms. McLain and Mother, as well as the juvenile court's order, reveals that the juvenile court did not order DCS to provide Mother with the utility deposit for her new apartment. The statement from the order relied on by Mother is found in that section of the court's order setting forth the facts relevant to the hearing, and the court does not specifically mention the utility deposit when entering its order addressing the custody and visitation issues before the court at the time. Furthermore, Ms. McLain testified that, when they visited the apartment on June 10, 2003, she mentioned the utility deposit to Mother and Father once again. Ms. McLain stated that Mother and Father reiterated they could secure the money for the utility deposit. However, Mother subsequently told Ms. McLain that same day that she had already spent all of the check she received a few days prior on June 1, 2003. Additionally, we note that the trial judge heard and observed Mother and Ms. McLain as they testified, and we give the trial judge's determinations of credibility great weight on appeal. *See In re S.L.R.*, No. M2004-01565-COA-R3-PT, 2004 Tenn. App. LEXIS 880, *34–35 (Tenn. Ct. App. Dec. 28, 2004).

At the time of trial, Mother testified that she alternated between living with her mother or Father's parents. In March of 2004, Ms. McLain inspected the home of Father's parents, which is where Mother and Father stated they intended to live with the Children. Upon doing so, Ms. McLain noted that the home was not secure, having large cracks around the door; she observed rats walking on the back of the stove; she observed roaches crawling inside the home; the only bath tub in the home contained wood and a chainsaw; and Father had to touch two wires together in order to make the toilet flush.

At trial, Mother introduced a letter dated May 3, 2004, from another apartment complex indicating that she was on a waiting list for an apartment. However, the likelihood that Mother will be able to secure this new apartment, in all reasonable probability, is minimal. This new apartment, like the previous apartment, is considered "Section 8" housing. The criminal records of Mother and Father were introduced at trial. Father's criminal history reveals a prior plea of guilty in 1992 to the charge of raping a minor, his twelve-year-old cousin. In March of 2004, Mother was charged with being an accessory after the fact when she attempted to cash lottery tickets at the same business from which Father allegedly stole the tickets the previous day. On April 6, 2004, Mother plead guilty to the charge of theft under $500.00 and received a suspended sentence.

Ms. Bushears testified that, pursuant to federal law, individuals with a criminal history similar to that of Mother and Father would not be allowed to live in "Section 8" housing. Ms. Bushears stated that, at the time of processing their application, she was not aware of the parents' criminal histories. She explained that, even if they had moved into the apartment, she would have been required to terminate their lease upon learning of their prior convictions. Mother admitted at trial that she had not informed the manager at the apartment complex where she was currently attempting to secure housing of her prior criminal record. Accordingly, the record clearly and convincingly establishes that Mother has failed to secure safe, stable housing, and there is little likelihood that this condition will be remedied at an early date.

Despite the services provided since December of 2000, the primary reason for finding that the Children were dependent and neglected and needed to be removed from Mother's custody was her inability to properly provide for their medical and nutritional needs. Ms. McLain testified that she referred Mother to an original series of parenting classes, which Mother completed. However, Ms. McLain, after observing Mother's subsequent interaction with the Children during visitation, felt that Mother needed additional parenting classes. Approximately eighteen months after C.L.M. and J.V.P. were placed into the custody of DCS, J.L.M. was placed into the custody of DCS because Mother failed to provide for her medical and nutritional needs as well. At Ms. McLain's request, Mother completed a second set of parenting classes. However, Ms. McLain subseqeuntly observed that, while Mother showed affection toward the Children, she would get impatient with the Children, become frustrated, and allowed them to wander off during visitation.

Even if we were to agree with Mother, in that DCS prevented her from obtaining suitable housing, Mother overlooks additional conditions present in the record which still persist. Section 36-1-113(g)(3)(A) permits a court of this state to terminate a parent's parental rights based not only on a failure to remedy the conditions which led to removal but the persistence of "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s)." Tenn. Code Ann. § 36-1-113(g)(3)(A) (2003); *In re S.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003).

There are additional conditions present in this case which have a direct bearing on our analysis. There is every indication in the record that Mother intends to continue her relationship with Father. In fact, at the time of trial, Mother was pregnant with their fourth child. Additionally, Mother is currently unemployed, and receives social security disability benefits in the amount of approximately $680.00 per month. Further, Sally McDonald ("Ms. McDonald"), a licensed therapist with J.B. Summers Mental Health Center, testified that she evaluated Mother and Father at the request of DCS. Ms. McDonald stated that, during the initial evaluation, Mother was "not forthcoming" and was "guarded." Following their initial evaluation, Ms. McDonald referred Mother for further psychiatric evaluation, and Mother was subsequently prescribed medication for depression. Mother's psychological records were introduced at trial, and Mother testified that she first went to J.B. Summers Mental Health Center as a teenager for counseling after she had been sexually assaulted at the age of ten. Regarding her most recent psychological treatment, Ms. McDonald testified that they discharged Mother after she failed to appear for a scheduled appointment. Despite the concerns of DCS about Mother's mental health, Mother testified that, at the time of trial, she was not undergoing therapy. All of the aforementioned facts clearly and convincingly establish that "other conditions" exist in this case that in all likelihood will not be remedied at an early date.

Regarding the last factor set forth in section 36-1-113(g)(3)(A) of the Tennessee Code, Mother asserts that, despite the existing relationship between the Children and their parents, Deloris Tyis ("Ms. Tyis") and her husband, the current foster parents, have expressed a desire to adopt the Children. Mother argues, therefore, that the continuation of the parent/child relationship would not work to diminish the Children's chances of finding a safe, stable, and permanent home with Ms.

Tyis. We disagree. Requiring the Children to remain in foster care while Mother seeks to remedy the conditions which prevent their return to her custody, as Mother appears to suggest, would relegate the Children to an unpredictable future. We are reluctant to place children in limbo indefinitely. *See State v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990); *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 Tenn. App. LEXIS 415, at *58 (Tenn. Ct. App. June 3, 2003); *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 Tenn. App. LEXIS 474, at *20 (Tenn. Ct. App. July 21, 2000). The record clearly and convincingly reveals that continuing the parent/child relationship in this case will greatly diminish the Children's chances of early integration into a safe, stable, and permanent home.

We find that the record supports the trial court's conclusion that DCS has proven by clear and convincing evidence each factor set forth in section 36-1-113(g)(3)(A) of the Tennessee Code justifying the termination of Mother's parental rights. Since we so find, we need not address Mother's additional arguments related to the other grounds relied upon by the juvenile court for terminating her parental rights. *In re C.W.W.*, 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000).

### B.
### *Reasonable Efforts*

On appeal, Mother does not raise, as a separate and distinct issue, whether DCS made reasonable efforts toward reunification in this case. Instead, Mother argues, within the context of her other issues, that DCS failed to use reasonable efforts to assist her in obtaining suitable housing. Due to the consequences of the decisions reached in cases of this nature, we will undertake to examine whether DCS used reasonable efforts beyond the housing issue.

Unless permitting a child to remain with the biological parent will expose the child to a substantial risk of harm, DCS must make "reasonable efforts" to "[p]revent the need for removal of the child" or, if the child has already been removed, to "[m]ake it possible for the child to return home." Tenn. Code Ann. § 37-1-166(a) (2003); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *22–23 (Tenn. Ct. App. Mar. 9, 2004). The burden of proving that reasonable efforts have been made in a particular case falls upon DCS. Tenn. Code Ann. § 37-1-166(b) (2003). In meeting this burden, DCS is required, as it did in this case, to file with the juvenile court an affidavit setting forth the "reasonable efforts" made by DCS. Tenn. Code Ann. § 37-1-166(c) (2003).

Whether DCS has used reasonable efforts in a particular case is a fact specific inquiry, and we examine such efforts on a case-by-case basis. The legislature has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2003). While DCS bears the burden of proving that reasonable efforts toward reunification are made in a particular case, we are cognizant of the fact that "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *State v. Belder*, No. W2003-02888-COA-R3-PT, 2004 Tenn. App. LEXIS 441, at *24 (Tenn. Ct. App. July 9, 2004); *State v. Malone*,

No. 03A01-9706-JV-00224, 1998 Tenn. App. LEXIS 83, at *5–6 (Tenn. Ct. App. Feb. 5, 1998). The efforts employed by DCS in a particular case do not have to be "Herculean," *In re C.M.M.*, 2004 Tenn. App. LEXIS 160, at *25, but they must be "reasonable efforts." Tenn. Code Ann. § 37-1-166(a)(1) (2003); *Malone*, 1998 Tenn. App. LEXIS 441, at *6.

We begin with Mother's assertion that DCS failed to use reasonable efforts to assist her in securing safe, stable housing, particularly that DCS failed to pay for the utility deposit. The juvenile court held that DCS "made reasonable efforts to assist Respondents to establish a suitable home for the children, but the Respondents have made no reasonable efforts to provide a suitable home." After reviewing the record, we find that the evidence presented at trial clearly and convincingly supports this finding. As previously stated, we disagree with Mother's assertion that the juvenile court ordered DCS to provide the utility deposit. Mother testified that the original agreement was for the parents to pay the utility deposit, but, after the juvenile court entered the order stating that DCS would pay the deposit, she believed that DCS was responsible for this obligation. Even if this belief were well founded, Ms. McLain testified that, when they visited the apartment the day after the juvenile court issued the order, she reiterated that the utility deposit would be the parent's responsibility. Ms. McLain stated that Mother and Father agreed to be responsible for the utility deposit subsequent to the court's order. The record also reveals that Ms. McLain secured $899.00 from DCS to pay for the first month's rent, lease deposit, and furniture for the new apartment. Ms. McLain secured the application for the apartment and assisted Mother and Father with filling out the application. We cannot say that it was unreasonable for DCS to require the parents in this case to supply the utility deposit.

The efforts engaged in by DCS in this case are not isolated to assisting Mother with obtaining adequate housing. DCS has been providing services to this family since December of 2000. Out of concern that Mother was not providing for the Children's nutritional and medical needs, the Fayette County Health Department monitored the Children. DCS referred Mother to two sets of parenting classes and mental health therapy. Mother testified that she did not have a driver's license, but Ms. McLain stated that she offered to take Mother to visitation if she called. DCS has also provided physical and speech therapy to the Children to improve their development, as well as various other social services to this family. We find that the record contains clear and convincing evidence that DCS used reasonable efforts toward reunifying the Children with Mother.

## C.
### *Best Interest of the Children*

In her final issue raised on appeal, Mother asserts that DCS failed to prove that terminating her parental rights was in the best interest of the Children. Before a court in this state can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2) (2003). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

(1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2003).  This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn. App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002).

Mother takes each statutory factor and points to instances in the record where she alleges that DCS failed to prove the existence of a particular factor.  The juvenile court found that, based upon the statutory factors, termination of Mother's parental rights was in the Children's best interest.  We must agree.  As previously discussed, Mother has not only failed to remedy the conditions which led to removal, but there are other conditions which still persist making it unsafe for the Children to be returned to her custody.  Tenn. Code Ann. § 36-1-113(i)(1) (2003).  We have previously determined that DCS made reasonable efforts to assist Mother in reuniting with the Children, however, the

record reveals that, despite these services, Mother has failed to make a lasting adjustment.  Tenn. Code Ann. § 36-1-113(i)(2) (2003).  Ms. McLain testified that Mother came to every scheduled visitation with the Children, Tenn. Code Ann. § 36-1-113(i)(3) (2003), however, she also stated that, during the visitation, Mother failed to demonstrate appropriate parenting and never asked for visitation beyond the four hours scheduled each month.  The Children's young age when they entered DCS custody, the length of time they have remained in DCS custody, and Mother's behavior during visitation all indicate that no meaningful relationship has been established between Mother and the Children.  Tenn. Code Ann. § 36-1-113(i)(4) (2003).

The record reveals that the Children are developmentally delayed and are undergoing speech and physical therapy.  The record also reveals that Mother has been unable to demonstrate that she can adequately provide for the Children's medical and nutritional needs which necessitated their removal in the first instance.  Tenn. Code Ann. § 36-1-113(i)(5) (2003). Additionally, while there is no indication in the record that Mother or Father has either sexually or physically abused the Children, we must consider that Father has previously been convicted of raping a minor relative.  Tenn. Code Ann. § 36-1-113(i)(6) (2003).  We cannot evaluate the physical environment of Mother's home because, as she conceded at trial and on appeal, she has yet to secure stable housing.  The home that Mother wanted to raise the Children in, that of Father's parents, was inspected by Ms. McLain and found to be insufficient.  Tenn. Code Ann. § 36-1-113(i)(7) (2003).  DCS referred Mother to a mental health facility for an evaluation, but the facility discharged her after she failed to attend one of her visits.  Mother alleges that the visit she missed was only to monitor her medication for depression.  While the significance of this visit may be trivial, we cannot overlook the fact that Mother failed to attend as required.  Despite concerns about Mother's mental health, she freely admitted at trial that she was not presently undergoing counseling.  Additionally, Ms. McLain testified that, during visitation with the Children, Mother was frustrated, impatient, and failed to adequately supervise the Children.  Tenn. Code Ann. 36-1-113(i)(8) (2003).

The record does indicate, as Mother points out, that DCS stipulated at trial that they did not offer proof that Mother failed to pay child support in this case.  (T.E. Vol. 2, p. 131).  Therefore, this factor weighs against terminating Mother's parental rights.  Tenn. Code Ann. § 36-1-113(i)(9) (2003).  However, this single factor cannot cloud the fact that the record clearly and convincingly demonstrates that termination of Mother's parental rights is in the best interest of the Children.

## IV.
### CONCLUSION

For the reasons set forth herein, we affirm the decision of the juvenile court in terminating Appellant's parental rights.  Costs of this appeal are to be taxed to Appellant, Taketa Puryear, for which execution may issue if necessary.

                                                             
ALAN E. HIGHERS, JUDGE