# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 6, 2007 Session

## IN RE: A. R. AND J. R.

**Appeal from the Juvenile Court for Davidson County**
**No. 2019-657668, 2019-57670      Betty Adams Green, Judge**

---

**No. M2007-00618-COA-R3-PT - Filed December 13, 2007**

---

Both parents appeal the termination of their parental rights on the ground of substantial non-compliance with the permanency plan and failure to remedy persistent conditions. The dispositive issue is whether the Department failed to make reasonable efforts to reunite the family. The reasonableness of the Department's efforts to reunite a family is dependent upon whether the services rendered were adequate to meet the needs of the family. In this case, the Department knew both parents needed significant psychological services to afford them the reasonable opportunity to meet the goals of the permanency plans and to remedy persistent conditions. The Department knew this because the psychologist who performed the mental health assessment of each parent at the direction of the Department issued a report recommending that both parents receive specific and significant mental health counseling. The record fails to establish that the Department provided the essential psychological services, without which the other services provided by the Department could not meet the needs of either parent or the family. Accordingly, we vacate the order terminating the mother's and father's parental rights and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Vacated and Remanded

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., and DAVID H. WELLES, SP. J., joined.

Thomas H. Miller, Nashville, Tennessee, for the appellant, T.L.R.

Nick Perenich, Nashville, Tennessee, for the appellant, S.R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, for the appellee, State of Tennessee.

Jeanah P. McClure, Nashville, Tennessee, guardian ad litem.

## OPINION

On February 20, 2007, the Juvenile Court in Davidson County terminated the parental rights of Mother and Father in their relationship to their two minor children, A.R. and J. R. Although the parents had a prior history with the Department, the facts surrounding the termination at issue began on March 1, 2004, when the Department, acting on a referral, filed a petition for emergency removal of the children due to the parents' unwillingness to provide stable housing, gain stable employment, and Mother's failure to protect the children from the risk of abuse from Father. The Department gained emergency protective custody and removed the children from the parents. The children's maternal grandparents were later granted temporary custody of the children.

Subsequently, the children's guardian ad litem filed an intervening petition for dependency and neglect. Pursuant to an agreed order of the parties, the court granted the petition and found the children to be dependent and neglected. In its order, the court found that Mother was living in a hotel, had no employment, and was not providing assistance to her children. With regard to Father, the court found that he had been diagnosed with bipolar disorder, was not following his treatment, and Father testified that he was willing to give custody of his children to the maternal grandparents.

In November 2004, the grandparents, who had physical custody of the children, informed the court that they could no longer take care of their grandchildren. Accordingly, the Department regained custody of the children. Soon thereafter, the guardian ad litem for the children filed a petition reflecting these developments and made additional allegations of dependency and neglect by the parents.[1]

In December of 2004, the parents attended a meeting with the Department to develop initial permanency plans for both parents, the goal of which was to reunify the family. Pursuant to the plan, Father was required to: (1) receive a psychological assessment, a parenting assessment, and mental health counseling; (2) provide the Department with proof of suitable residence and cooperate with the Department on a homestudy; and (3) provide proof of income and comply with child support orders. Mother was required to: (1) receive a psychological assessment, parenting assessment, and mental health counseling; (2) provide proof of suitable housing to the Department and cooperate in a homestudy; (3) assure that anyone living with her would be subject to a background check prior to any contact with the girls and must cooperate with the parenting plan; and (4) provide proof of income and comply with child support orders. Both parents were present; however, neither of them signed the plan.

After observing a parent-child visit, the guardian ad litem filed a motion seeking increased services from the Department in an attempt to spur on reunification. Specifically, the guardian ad litem requested that the Department provide Mother with in-home parenting skills training, believing that without specialized training, the permanent placement of the children would be delayed. In addition to the request for training, the guardian ad litem also noted the need for the parents to undergo psychological evaluations and parenting assessments.

---

[1] The court did not decide this petition until July of 2005, and the outcome is discussed in detail below.

In May 2005, after Mother had received parental training and both parents appeared to make progress as more effective parents, the Department placed the children back into the parents' custody for a ninety-day trial home placement. The placement, however, was unsuccessful. After only three weeks, a domestic altercation between Father and Mother's paramour led to the removal of the children, which also led to Mother's departure from the residence.[2] Thereafter, Mother lived with her paramour, and the children were placed in the care of foster parents.

In July 2005, the trial court ruled on the emergency petition filed in 2004. The court found the children were dependent and chronically neglected by both Mother and Father[3] and that Mother and Father were not fit to properly care for her children and unable to meet the needs of the children.[4]

In August 2005, the court approved a revised permanency plan for each parent that, unlike the previous plans, provided for alternate goals. One goal was reunification of the family, which had been the only goal of the initial plan. The alternate goal, should the plan for reunification fail, was adoption. A key component of each plan pertained to the mental health needs of each parent. The desired outcome under the plan for Mother was for her to become mentally stable. Specifically, the revised plan called on Mother to: (1) attend Centerstone for a re-evaluation and follow all recommendations; (2) attend abuse counseling; (3) attend non-offending parenting classes; and (4) attend domestic violence classes. Under the revised plan Father was to: (1) participate in individual mental health counseling and follow all recommendations; (2) participate in domestic violence counseling and follow all recommendations; (3) maintain a home that is free of domestic violence; and (4) maintain a stable income.

In December 2005, the court scheduled a hearing, at Mother's request, to address her visitation rights and restrictions. Mother, however, failed to appear at the December hearing. Thereafter, the court made a finding of abandonment by Mother based upon her failure to appear at the December hearing and her failure to take steps to schedule other visitation.

One month later, on January 26, 2006, the Department filed a petition to terminate the parental rights of both Father and Mother. The grounds stated in the petition for termination consisted of abandonment for failing to provide support and failing to visit the children, failing to comply with the permanency plans, and failing to remedy the persistent conditions which led to the children's removal.

---

[2]The Department removed the children on June 13, 2005.

[3]The court also found that the children were dependent and neglected by their grandparents.

[4]The court made numerous other findings including a finding that Father was responsible for "exposing the children to chaos" as the result of his tumultuous relationship with Mother.

The trial court conducted a six-day trial over the course of seven months, during which numerous witnesses including both Father and Mother testified.[5] On February 20, 2007, after the trial was complete, the trial court issued an order granting the petition, terminating the parental rights of both Father and Mother on the following grounds: (1) failure to substantially comply with the Permanency Plans, (2) failure to remedy persistent conditions, and (3) abandonment.

The trial court found that Mother failed to substantially comply the Permanency plan because she failed to adequately attend various counseling appointments, failed to maintain suitable employment, and failed to provide stable and suitable housing. Additionally, with regard to non-compliance with the Permanency Plans, it found that Father failed to adequately attend his mental health appointments, failed to provide proof of a stable income, and failed to provide a home that is free from domestic violence. Ultimately, the court concluded that "[n]either parent complied with any components of the permanency plan to any measurable extent."

Moreover, the trial court concluded that "[n]either parent has made any progress in remedying the conditions that lead to the removal of the children from their custody." The trial court stated, "[t]he history of the case demonstrates that [Father and Mother] are completely incapable of parenting the children such that a return of the children to them would result in the same type of chronic and severe neglect that the Court has found on many occasions." It also found that Mother abandoned her children based on her failure to appear at a visitation hearing which she had requested and her failure to make an effort to otherwise establish a meaningful relationship with the children. Likewise, the court found that Father had also abandoned the children by willfully failing to pay child support.

The trial court determined that the Department and the Community Services Agency made reasonable efforts at reunification, which included, *inter alia*, bill payment, parenting skills training, and assistance with housing. The court, however, made no specific finding as to the reasonableness of the Department's efforts with regard to any mental health assistance to Father and Mother. Lastly, the trial court found the termination of parental rights to be in the best interest of the two minor children at issue.

Mother raises two issues on appeal: (1)whether the Department failed to exercise reasonable efforts to reunite the children with their mother after the removal of the children; and (2) whether the trial court erred in finding that the Mother abandoned her children.

Father raises four issues on appeal: (1) whether the trial court erred when it found the Department made reasonable efforts to assist him to reunite with his children; (2) whether the trial court erred in finding abandonment; (3) whether the trial court erred by finding that Father did not comply with the Permanency Plan; (4) whether the trial court erred in finding persistent conditions.

## II.

---

[5]The first day of trial was June 20, 2006, and the final day was January 10, 2007.

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Proceedings concerning the termination of parental rights are governed by statute. Tenn. Code Ann. § 36-1-113; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). The party seeking to terminate parental rights must prove two elements. The first is that a statutory ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1) (2005); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The second is that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2) (2005); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). *See In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child).

Termination of parental rights must be based upon a finding by the court that a ground for termination has been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett* 92 S.W.3d 835, 838 (Tenn. 2002). The existence of any one statutory ground properly alleged in a petition which establishes that a parent is unfit and is sufficient to support a termination of parental rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The Department need not prove all the statutory grounds alleged in the petition. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (abrogated on other grounds). If the trial court finds more than one ground upon which to terminate parental rights, on appeal the Department only needs to sustain the finding of one of the grounds. *See* Tenn.Code Ann. § 36-1-113(c)(1); *see also Jones*, 92 S.W.3d at 838; *In re C.W.W.*, 37 S.W.3d at 475-76) (abrogated on other grounds) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child); *In re M.C.G.*, No. 01A01-9808-JV-00461, 1999 WL 332729, at *5 (Tenn. Ct. App. May, 26, 1999).

The elements stated above must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The clear and convincing evidence standard is a heightened burden of proof which serves to minimize the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. The clear and convincing evidence standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). It is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. 745, 766 (1982); *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), yet it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App.1987). Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence, *see Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992), and it should produce a firm

belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

## III.

Both parents were found to have failed to substantially comply with the Permanency Plans and to have failed to remedy persistent conditions. Whether one or both of the parents substantially complied with the Permanency Plans or remedied the persistent conditions that led to the removal of their children are not the dispositive issues on appeal. Instead, we have determined the dispositive issue is whether the Department exerted reasonable efforts to enable the parents to comply with the Plans and to remedy the conditions that led to the children's removal.

### A.
### THE REQUIREMENT OF REASONABLE EFFORTS

The General Assembly adopted the policy that "the Department should make 'reasonable efforts' to preserve, repair, or restore parent-child relationships whenever reasonably possible . . . ." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn. Ct. App. Mar. 9, 2004). Consistent therewith, the General Assembly had also placed a duty on the courts to assure that the remedial efforts exerted by the Department were reasonable. *See* Tenn. Code Ann. § 37-1-166(a). This statutory policy does not require that the Department's effort to reunify the family be "herculean." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006). Department employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* In short, they must make reasonable efforts at reunification. Further, the Department must do more than merely provide a list of services to the parent, point them in the right direction, and rely on parents to facilitate their own rehabilitation. *In re M.B.,* No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide *services related to meeting the needs of the child and the family*." Tenn. Code Ann. § 37-1-166(g)(1) (emphasis added). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d 148, 158-59 (Tenn. Ct. App. 2007)(footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *Id.* at 159. Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the

conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *See State Dep't. of Children's Servs v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App.2006) (citations omitted).

B.
THE DEPARTMENT'S EFFORTS CONCERNING MOTHER

The children were removed from their parents on March 1, 2004, and legal custody was awarded to the Department on March 2, 2004, pursuant to an Emergency Protective Custody Order. Subsequently, in May of 2005, the children were temporarily placed back into the parent's care for a ninety-day home trial placement; however, the Department retained legal custody of the children. In fact, the Department has retained legal custody of the children since the emergency removal in March of 2004.

From the outset of this case, it is most evident the Department was aware of and concerned with Mother's mental health. The December 12, 2004 Permanency Plan expressly recognized this concern due to the fact Mother was required to receive a psychological assessment. On March 21, 2005, David W. Frensley, M.A., a Senior Psychological Examiner, conducted a psychological evaluation of Mother.[6] Following a thorough examination of Mother, Mr. Frensley determined that moderate levels of depression exist and that "Severe Dysthymic character features exist." He made specific notations with regard to her depression, anxiety and past passive suicidal thoughts. Mr. Frensley also noted that Mother is an "odd, peculiar and eccentric individual who lacks basic social skills." He further noted that "social withdrawal secondary to [Mother]'s depression may also occur as she may have lost interest in daily activities and have low energy." Mr. Frensley stated "[h]er insight is limited with regard to the origin of her behavior, and judgmental deficiencies arise from her lower intellectual functioning, overdependence on others, and limited abstract problems solving skills." Significantly, Mr. Frensley concluded that Mother's mental issues carry over into the relationship with her children, may impair her ability to handle her parenting responsibilities, that "[t]he potential for child abuse and neglect is heightened, and the likelihood exists that it will be difficult to engage [Mother] in a therapeutic program." Of further significance, he specifically noted that "[Mother] reports a high level of psychological distress that would impair her ability to parent her children."

Based upon these findings and conclusions regarding Mother's mental health, Mr. Frensley compiled a list of treatment considerations, including specifically "individualized therapy" as opposed to group therapy. Moreover, Mr. Frensely noted that the therapist must slowly approach Mother and build rapport with her due to her level of mistrust and suspicion. He also recommended that a "cognitive behavioral" approach be employed to teach Mother how to acknowledge and detach

---

[6]Ms. Vikkeya Gordon, Mother's case manager at the time, referred Mother to Mr. Frensley.

from her feelings because she is prone to acting directly on emotions without thinking.[7] Mr. Frensley also recommended that her primary therapist could serve as a source of information with regard to [Mother]'s readiness to resume responsibility for her children. Further, he noted that her therapist should monitor her for delusions and hallucinations to help evaluate whether a formal thought disorder exists. Additionally, he recommended that Mother receive parenting training, that her training include visual modalities to compensate for her poor verbal skills, and that Mother should involve herself in a group for survivors of sexual abuse due to her being a victim of sexual abuse beginning at age thirteen.

The Department received Mother's psychological evaluation on April 7, 2005. The record indicates that Mr. Frensley faxed the evaluation to Vikkeya Gordon, Mother's case manager at the time. There is, however, no evidence to show that Ms. Gordon or the Department took any action in furtherance of Mr. Frensley's recommendation.

Three months later, on July 30, 2005, shortly after the failed trial home placement, Phenessia Thompson became the foster care case manager and remained the case manager thereafter.[8] The Department concedes that Ms. Thompson did very little to assist Mother until a year later, after the trial to terminate Mother's parental rights began.[9] Ms. Thompson admitted at trial that she had not read Mother's psychological evaluation and recommendations from Mr. Frensley until April 6, 2006, when Mother's counsel submitted interrogatories to the Department, and had taken no action to assist Mother prior to the commencement of the trial.

Mr. Frensley's evaluation recommended specific services and therapies including individualized therapy, a "cognitive behavioral" approach, and use of visual modalities. He also stressed the importance of building rapport with Mother during treatment. There is, however, no evidence that the Department attempted to provide the services recommended by Mr. Frensley. Moreover, there is no explanation why the recommendations were not implemented or why they were not appropriate in this case.

Without the assistance of the Department, Mother received some "group counseling" at Centerstone Mental Health Center.[10] There is, however, no evidence to demonstrate that the

---

[7]Mr. Frensely also noted that she would profit from therapy for her significant anxiety.

[8]Ms. Thompson's original involvement with the parties at issue began in September 2000, based upon a referral to the Department.

[9]There is no indication in the record that Ms. Gordon, Mother's prior case manager significantly reviewed the evaluation and carried out the recommendations.

[10]Mr. Frensley noted that Mother was receiving therapy for depression at Centerstone at the time of the evaluation, but the record is unclear as to whether this therapy was continued. Further, Mr. Frensley's evaluation provides no indication that the Department was assisting Mother in her therapy in any regard. Records from Centerstone indicate that Mother's first appointment, in the form of an intake assessment, was scheduled for June 30, 2004, five months prior to the drafting of the first permanency plan. After that appointment, Mother's attendance at her scheduled
(continued...)

Department provided Mr. Frensley's evaluation and recommendations to Centerstone. Ironically, the record indicates that Mother provided a copy of the evaluation to Centerstone; however, this is of little consequence because there is no evidence that any of the specialized services or individual therapy recommended by Mr. Frensley were provided to Mother.

This Court dealt with a strikingly similar situation in *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *1 (Tenn. Ct. App. Apr. 14, 2004). In *In re M.E.*, Mother appealed the termination of her parental rights contending the Department failed to make reasonable efforts at reunification. After the mother's children were found to be dependent and neglected, the court ordered the mother to undergo a psychological evaluation. The evaluation noted that Mother's mental capacity was limited. *Id.* at *2. The Department failed to provide mental health counseling at that time.

Three years later, Mother underwent an initial intake psychological evaluation, and a copy of the evaluation was provided to the Department and the juvenile court. *Id.* The report cited numerous emotional deficiencies and recommended that the mother would benefit from the use of visual aids and modeling whenever possible. The Doctor also recommended that she have "individual psychotherapy with a therapist who is effective in treating dependent personality and its associated problems." *Id.*

The report was provided to the Department; however, the services recommended by the Doctor were never provided to the mother. The Court stated that the Department provided numerous services to the mother, but "the record reveals the Department failed to provide the most obvious and essential service Mother needed, the mental health services recommended by the Doctor." *Id.* at *7. With regard to the specific role of the case manager, the Court stated, "one of the first things a case manager, who takes responsibility for a case that has been open for a while, would do would be to review the file to ascertain what has been accomplished and what needs to be done. That was not done in this case." *Id.* at *8.

The Court concluded by stating, "[w]hile the Department provided numerous services, the failure to provide the individualized psychological services, the need for which were most evident from Dr. Bogg's report, mitigates the beneficial value of the other services provided by the Department and its service providers." *Id.* at *10. Accordingly, the Court found that the Department failed to make reasonable efforts by not providing the mental health services that were recommended.

---

[10](...continued)

appointments was lacking. Centerstone records indicate that Mother failed to show up for a number of appointments scheduled after the psychological assessment was completed by Mr. Frensley. Mother's failure to attend these appointments, while a factor in our determination, is not fatal to her contention that the Department failed to make reasonable efforts. Of much greater importance is the fact the record fails to show that the Department made any effort to implement the recommendations of Mr. Frensley or to explain why those recommendations were inappropriate in this case.

The same is true in this case. While Mother was scheduled for appointments at Centerstone, there is no way for this Court to determine whether the services that were to be provided were those recommended by Mr. Frensley because there is no evidence in the record.[11] Further, there is no evidence that the Department scheduled Mother's appointments at Centerstone, nor is there any evidence that the appointments were scheduled to assist reunification.

The Department failed to produce any record of contact with Centerstone regarding Mother during this time period. In fact, until after the termination petition was filed, there is nothing in the record to indicate that the Department or the new case manager, who took over the case in July of 2005, had any contact with Centerstone regarding Mother's mental health treatment. Mother's case manager, Ms. Thompson, was asked at trial:

Q: [Mother's Counsel] What did you do, during the time you were the case manager, to assist Ms. Richardson in doing what she needed to do under the permanency plan?
A: [Ms. Thompson] Nothing. She hadn't requested help.

Clearly and admittedly, after July 2005, the Department did nothing with regard to Mother's mental health treatment. The record contains no evidence that Mother was receiving the mental health counseling that she needed, nor is there any evidence that the Department did anything to assure Mother's rehabilitation. Simply put, the Department dropped the ball.[12]

Of further concern to this Court is the August 1, 2005 updated Permanency Plan, the goal of which is "Reunify with Parent(s) / Adoption." Because this plan had a stated goal of reunification, it is clear that the Department, in August of 2005, was still under a duty to make reasonable efforts at reunification. The Department has admitted, however, that they failed to make reasonable efforts after the failed trial home placement in June of 2005. The fact the Department stated reunification as a goal and failed to take any action to meet Mother's needs in order to facilitate reunification until the termination petition was filed greatly undermines any basis for the Department to contend that it fulfilled its obligation to made reasonable efforts to reunify Mother with her two children.

As we concluded in *In re M.E.:*

Once the Department separated the children from Mother, its first priority was to restore the family unit if at all possible. *In re C.M.M.*, 2004 WL 438326, at *6. The Department had the affirmative duty to make reasonable efforts to make it possible

---

[11]The Centerstone records indicate that Mother participated in approximately four "group therapy" sessions and one individualized session, which lasted thirty minutes. The record with regard to these sessions, however, does not indicate that the recommendations of Mr. Frensley were being followed.

[12]While it is well settled that "parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody," *In re Giorgianna H.*, 205 S.W.3d at 519, Mother was admittedly clinically depressed and the Department did little, if anything, to facilitate her rehabilitation.

for the child to return safely to the child's home. Tenn.Code Ann. § 37-1-166(a)(2)-(g)(2). The General Assembly defines reasonable efforts as the exercise of reasonable care and diligence by the department to provide services related to "meeting the needs of the child and the family." Tenn.Code Ann. § 37-1-166(g)(1). It is apparent from this record that the efforts of the Department were grossly inadequate for they did not meet the needs of Mother, R.B., M.B. and S.B. Accordingly, we vacate the order terminating Mother's parental rights and remand this issue to the juvenile court for further proceedings.

*Id.* at *10.

The Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meeting Mother's needs to assist her to remedy the persistent conditions and to fulfill her obligations under the Permanency Plans. The Department failed to produce the requisite evidence.

## C.
### THE DEPARTMENT'S EFFORTS CONCERNING FATHER

The services provided to assist Father are substantially similar to those provided to Mother, few and of little consequence. As with Mother, the Department was concerned with Father's mental health from the beginning of its involvement with this family and, therefore, referred him to the same Senior Psychological Examiner, Mr. Frensley, for a psychological evaluation. As he was requested to do, Father underwent a psychological evaluation by Mr. Frensley on April 27, 2005.

Following his evaluation, Mr. Frensley noted that Father had been diagnosed with bipolar disorder and that Father admitted to previous episodes of violent behavior. Mr. Frensely found that Father had little internal tension or anxiety that could "lead him to not be affected by consequences and [t]o fail to learn from his experiences." According to Mr. Frensley's written report, Father's intellectual function fell between the extremely low range to borderline.

Mr. Frensley recommended mental health therapy to address what he identified as a "hypomanic or cyclothymic" disorder. He also recommended that a "cognitive behavioral" approach be employed to teach Father how to think before acting. Mr. Frensley also stated, "Liaison between [Father]'s family, case manager, therapists and/or employer is essential."

The record, however, is devoid of evidence that the Department made any attempt to implement any of Mr. Frensley's recommendations. As with Mother, Father's case manager, Phenessia Thompson, did not review Father's mental health assessment until after the petition to terminate his parental rights had been filed. Moreover, there is no evidence that Ms. Thompson communicated with the therapists at Centerstone despite the fact that Mr. Frensley's assessment stated, "Liason between [Father]'s family, *case manager*, *therapists* and/or employer is essential." (emphasis added). The total lack of effort by the Department is epitomized by the stark testimony of the case manager, Ms. Thompson, as is evident from the following exchange:

-11-

Q: I believe when you first testified in this trial, and then subsequently, you were concerned about [Father]'s mental health condition, his mental health treatment.
A: Yes.
Q: Are you concerned about that?
A: Yes, because he - -
Q: Is that one of the circumstances or conditions that would prevent the children from coming back to [Father]'s home?
A: That's one.
Q: [Father] executed - - signed a release for you to get his mental healthcare records. Is that correct?
A: Correct
Q: They've been subpoenaed to the court?
A: Correct
Q: Have you read them yet?
A: I have not.
Q: Have you talked with [Father]'s therapist?
A: No
Q: Have you talked with [Father]'s psychiatrist?
A: No.

To add insult to injury, there is no evidence that the Department provided Mr. Frensley's recommendations and evaluations to Centerstone, as Mr. Frensley recommended.

Although the Department provided services to Father, the record reveals the Department failed to provide the most obvious and essential services Father needed, that being the specific mental health services recommended by Mr. Frensley. This failure is frustratingly similar to the Department's failure in *In re M.E.,* wherein we found "the record reveals the Department failed to provide the most obvious and essential service [the parent] needed, the mental health services recommended by the Doctor", *Id.* at \*7, and held the Department had failed to fulfill a essential statutory obligation. *Id.* at \*10.

Once the Department separated the children from Father, the Department's first priority was to restore the family unit if reasonably possible. *Id.* at \*9 (citing *In re C.M.M.*, 2004 WL 438326, at \*6). To accomplish this goal the Department had the affirmative duty to exert reasonable efforts to make it possible for the children to be returned safely. *Id.* (citing Tenn.Code Ann. § 37-1-166(a)(2)-(g)(2)). This requires providing services related to "meeting the needs of the child and the family." *Id.* (citing Tenn.Code Ann. § 37-1-166(g)(1)). As we found in *In re M.E.*, the efforts of the Department in this case were inadequate because they did not meet the needs of Father or his two children.

The Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meeting Father's needs to assist him to remedy the persistent conditions and to fulfill his obligations under the Permanency Plans. As is the case with Mother, the Department failed to produce the requisite evidence.

## D.
### BEING RELIEVED OF THE DUTY TO MAKE REASONABLE EFFORTS

Before we conclude our analysis of the issue of reasonable efforts, we wish to acknowledge the Department's argument that the statute does not require multiple "futile efforts on behalf of unresponsive parents," and that "since [the parents] ensured that any efforts would have been futile, [the Department]'s failure to make efforts was reasonable." We are in agreement with the first part of this argument, that the statutory scheme at issue does not require multiple "futile efforts," or as we have frequently stated, "Herculean efforts," where the parents' efforts, under the circumstances, are not reasonable.[13] *In re Giorgianna H.*, 205 S.W.3d at 519. This is due to the fact the road to reunification is a "two-way street." *See In re Tiffany B.*, 228 S.W.3d at 159. We, however, are not in agreement with the conclusion the Department has reached as it relates to the facts of this case.

As the Department correctly contends, the General Assembly has relieved the Department of its duty to provide reasonable efforts to assist parents from whose homes it has removed their children under certain statutorily defined circumstances, including

> when a court of competent jurisdiction has determined, among other things, that a parent has committed murder, voluntary manslaughter, felony assault, aggravated or especially aggravated kidnapping, aggravated child abuse, aggravated or especially aggravated sexual exploitation of a minor, rape, incest, severe child abuse, or "abandonment," as defined by Tenn. Code Ann. § 36-1-102(1).

*In re B.L.C., D.A.C. & J.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *8 (Tenn. Ct. App., December 6, 2007). The circumstances referenced above which relieve the Department of its responsibilities are labeled "aggravated circumstances" by Tenn. Code Ann. § 37-1-166(g). The foregoing notwithstanding, the General Assembly has also provided that except as provided in subdivision (g)(4) of Tenn. Code Ann. § 37-1-166, "reasonable efforts shall be made to preserve and reunify families: (A) Prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (B) To make it possible for a child to safely return to the child's home." Tenn. Code Ann. § 37-1-166(g)(2). If, however, "continuation of reasonable efforts of the type described in subdivision (g)(2) is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child." Tenn. Code Ann. § 37-1-166(g)(3).

The statute goes on to provide that reasonable efforts of the type described in subdivision (g)(2) shall not be required to be made with respect to a parent of a child *if a court of competent jurisdiction has determined*: (A) The parent has subjected the child, any sibling, or any other child residing in the home to aggravated circumstances; (B) the parent has committed one of the felonious

---

[13]Even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *See State Dep't. of Children's Servs v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006).

offenses identified in the statute; or (C) the parental rights of the parent to a sibling or half-sibling have been terminated involuntarily. *See* Tenn. Code Ann. § 37-1-166(g)(4).

The statute "relieves DCS of its responsibility to make reasonable efforts *only if* a court of competent jurisdiction has made a determination" that aggravated circumstance or one of the other statutory requirements exists. *In re B.L.C.*, 2007 WL 4322068, at *9. As the court further noted, "the statute does not allow the Department to do nothing on a parent's case, providing no assistance, in the hopes that a court will later make a finding of abandonment that retroactively 'forgives' [the Department's] lack of efforts, *particularly when, as is the case here, [the Department]'s failure to make a reasonable effort arguably was a significant factor in enabling [the Department] to argue that Mother abandoned her children.*" *Id.* (emphasis added). The court went on to reason that

> the most reasonable and natural interpretation of the statute at issue is that [the Department] is relieved of its responsibility to make reasonable efforts to assist in the preservation and reunification of families that the State has decided to separate *at such time* that a court of competent jurisdiction makes the required determination of aggravated circumstances, and not before. Prior to such a determination, [the Department] must continue to make reasonable efforts. To hold otherwise would be to create an unacceptable level of uncertainty among [the Department]'s staff members as to whether, and when, they are required to exercise reasonable efforts, because the answer to that question would not be clear until a trial court, or possibly an appellate court, rules on the issue of abandonment. A "wrong guess" on DCS's part would create an unacceptably long delay in an area of the law, termination of parental rights, where expediency is of particular importance. . . .

> In summary, we do not agree with [the Department]'s argument that it had no duty in this case to make reasonable efforts to assist Mother from the time it took custody of the children until [the Department] filed its termination petition as a result of the trial court's much later finding of abandonment. If, in a termination case, [the Department] believes it appropriate to be relieved of the responsibilities generally placed upon it by Tenn. Code Ann. § 37-1-166, [footnote omitted] it should petition the trial court for a "determination" described and required by Tenn. Code Ann. § 37-1-166(g)(4). Of course, what constitutes "reasonable" efforts on [the Department]'s part is defined and determined by the circumstances; in some situations a parent's conduct may make relatively minimal efforts "reasonable" under the circumstances. In such situations, or when [the Department] concludes that a parent is himself or herself making no efforts, or that efforts at a reunification attempt will be useless, several avenues will be available to [the Department] to obtain the judicial determination required by the statute. [The Department] may change the goal in parent's permanency plan, thereby triggering judicial review of the change, or [the Department] may proceed to file a termination petition. In any event, both the parents and the trial court will be placed on notice of [the Department]'s position that it should be relieved of further efforts, and of the facts and reasons supporting this position. It will further be clear to all parties involved, by virtue of the trial court's

determination, exactly at what point in time [the Department] is relieved from making reasonable efforts otherwise generally required.

*Id*. at * 9-10.

Based upon the record before us and the reasoning in *In re B.L.C.* we find no basis upon which to conclude that the Department was relieved of its duty to make reasonable efforts to assist Mother and Father to remedy the persistent conditions and to fulfill their obligations under the Permanency Plans. Moreover, as we determined earlier, the Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet Mother's and Father's needs to assist them to remedy the persistent conditions and to fulfill their obligations under the Permanency Plans, and it failed to produce the requisite evidence. Accordingly, we reverse the trial court's findings that the Department exerted reasonable efforts under the circumstances of this case.

E.
ABANDONMENT

The trial court found that Mother and Father abandoned their children, which both parents challenge on appeal. We will discuss the issue as to Mother first.

The trial court found that Mother had abandoned her children based upon the fact that she failed to appear at a visitation hearing that she had previously requested. This finding is set forth in the trial court's Order terminating Mother's rights. The Order reads:

> The Court suspended [Mother]'s visitation and contact with the children at a hearing on June 14, 2005 because of the Mother's outrageous conduct on the trial home placement which began on May 20, 2005. On October 21, 2005 [Mother] filed a Motion to Set Visitation and Reduce Child Support. The Mother appeared on November 7, 2005 and the case was reset for an evidentiary hearing on December 13, 2005. The Mother knew how to access the Court to seek and obtain visitation with her children, a hearing was scheduled at her request for December 13, 2005, and the Mother then failed to appear. *The Mother abandoned the children when she failed to appear at the hearing she requested and made no subsequent efforts to request that the Court set visitation with the Children for her*. (emphasis added).

Mother contends that the trial court's finding did not comport with any of the statutory definitions of abandonment and, therefore, the trial court's finding cannot be the basis for terminating Mother's parental rights on the ground of abandonment.[14] We agree.

Abandonment is defined in Tenn. Code Ann. § 36-1-102, as, *inter alia*:

---

[14]The Department chose not to brief the issue of abandonment.

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

(iii) A biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child; provided, that in no instance shall a final order terminating the parental rights of a parent as determined pursuant to this subdivision (iii) be entered until at least thirty (30) days have elapsed since the date of the child's birth;

Tenn. Code Ann. § 36-1-102(1)(A).

Proceedings concerning the termination of parental rights are governed by statute. Tenn. Code Ann. § 36-1-113; *Osborn*, 127 S.W.3d at 739. The party seeking to terminate parental rights must prove, *inter alia,* that a statutory ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1) (2005); *Jones*, 92 S.W.3d at 838. Termination of parental rights must be based upon a finding that a ground for termination has been established. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d at 367; *Jones,* 92 S.W.3d at 838. The facts upon which the trial court based its conclusion that Mother abandoned her children are not within the statutory definition of abandonment. Because these facts are not within the statutory definition of abandonment, they may not form the basis upon which to conclude that Mother abandoned her children. Without other evidence sufficient to satisfy the statutory criteria for the ground of abandonment, we must therefore reverse the finding that Mother abandoned her children.

The trial court also found that Father abandoned his children due to Father's willful failure to support or make reasonable payments toward child support. Father appeals this finding,

contending that he did, in fact, make reasonable payments toward child support. At oral argument, the Department conceded the abandonment issue as to Father.[15] We therefore reverse the finding of abandonment as to Father.

## IV.

### IN CONCLUSION

The judgment of the trial court terminating the parental rights of Mother and Father is hereby vacated, and this matter is remanded for further proceedings consistent with this opinion. The costs of appeal are assessed against the Tennessee Department of Children's Services.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[15]Counsel for the Department stated, "I am willing to concede that ground. . . . I did not pursue it in the brief, and I am not going to pursue it today."